## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

570 CONCRETE, LLC, ON BEHALF OF ITSELF
AND ALL OTHERS SIMILARLY SITUATED,

     *Plaintiff*,

       v.

SIKA AG; SIKA CORPORATION; CHRYSO, INC.;
GCP APPLIED TECHNOLOGIES, INC.;
COMPAGNIE DE SAINT-GOBAIN S.A.; SAINT-
GOBAIN NORTH AMERICA; MASTER BUILDERS
SOLUTIONS ADMIXTURES U.S., LLC; MASTER
BUILDERS SOLUTIONS DEUTSCHLAND GMBH;
CINVEN LTD.; CINVEN, INC.; THE EUCLID
CHEMICAL COMPANY; RPM INTERNATIONAL
INC.; AND DOES 1-10,

     *Defendants*.

Case No. _____

**Jury Trial Demanded**

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ............................................................................... 1

II.   JURISDICTION AND VENUE ........................................................................... 7

III.  PARTIES AND UNNAMED CO-CONSPIRATORS ........................................ 8

   A.  PLAINTIFF ............................................................................................................ 8

   B.  DEFENDANTS ....................................................................................................... 8

      1.  Sika ............................................................................................................. 8

      2.  Saint-Gobain Group ................................................................................... 9

      3.  Master Builders Group ............................................................................. 10

      4.  Euclid Group ............................................................................................. 12

      5.  Doe Defendants ......................................................................................... 12

   C.  AGENTS AND UNNAMED CO-CONSPIRATORS .......................................................... 12

IV.   FACTUAL ALLEGATIONS ........................................................................... 13

   A.  CCAs GENERALLY .......................................................................................... 13

      1.  CCAs Are an Essential Input in Cement, Concrete, and Mortar ............ 13

      2.  Types of CCAs ........................................................................................... 15

      3.  How CCAs Are Sold and Who Buys Them ............................................... 18

   B.  THE MARKET FOR CCAs IN THE UNITED STATES AND ITS TERRITORIES .......................... 20

   C.  GLOBAL ANTITRUST INVESTIGATIONS INTO DEFENDANTS' ANTICOMPETITIVE CONDUCT   23

   D.  DEFENDANTS EFFECTUATED THEIR CONSPIRACY THROUGH THEIR SHARED CCA TRADE
       ASSOCIATIONS .................................................................................................. 26

   E.  THE PRICES FOR DEFENDANTS' CCAs HAVE CLIMBED EXPONENTIALLY DURING THE
       CLASS PERIOD AND SEVERAL DEFENDANTS HAVE SIGNALED PRICE INCREASES PUBLICLY ...... 32

      1.  Defendants Have Exponentially Increased Their Prices on CCAs During the Class
          Period, Including by Imposing Surcharges ............................................... 32

      2.  Normal Market Forces Do Not Explain Defendants' Price Increases or Surcharges . 37

      3.  Defendants Have Admitted Normal Market Forces Do Not Explain Their Price
          Increases or Surcharges ........................................................................... 42

   F.  DEFENDANTS HAVE CONSOLIDATED THEIR CONTROL OVER CCAs ................................. 44

   G.  THE STRUCTURE AND CHARACTERISTICS OF THE MARKET FOR CCAs SUPPORT THE
       EXISTENCE OF A CONSPIRACY ............................................................................. 48

      1.  The Supply Side of the CCA Market Is Highly Concentrated, and the Defendants Are
          the Dominant Firms .................................................................................. 48

      2.  Barriers to Entry Are High ....................................................................... 50

        *3.*     *The Demand Side of the CCA Market Is Unconcentrated* ............................................. *51*

        *4.*     *Demand for CCAs Is Inelastic* ............................................................................. *52*

            a.    There Are No Substitutes for CCAs ................................................. 52

            b.    CCAs Are a Necessity ......................................................................... 53

            c.    CCAs Comprise a Small Share of the Cost of the Final Product............................ 53

    H.   DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONDUCT ...................................... 53

**V.**    **CLASS ACTION ALLEGATIONS** ........................................................ **54**

**VI.**   **INTERSTATE TRADE AND COMMERCE** ...................................... **57**

**VII.**   **ANTITRUST INJURY** .......................................................................... **57**

**VIII.**  **CLAIM** ........................................................................................................ **58**

**IX.**   **PRAYER FOR RELIEF** ........................................................................ **60**

**X.**    **JURY DEMAND** ....................................................................................... **62**

## TABLE OF FIGURES

Figure 1: Cement vs. Concrete vs. Mortar ................................................................. 14

Figure 2: How CCAs Are Used ................................................................................... 15

Figure 3: Types of CCAs, By ASTM Code ................................................................ 17

Figure 4: Picture of SikaMix AE-6 Packaging ......................................................... 19

Figure 5: CCAs Sold by Sika ...................................................................................... 21

Figure 6: CCAs Sold by Saint-Gobain Group .......................................................... 21

Figure 7: CCAs Sold by Master Builders Group ...................................................... 22

Figure 8: CCAs Sold by Euclid Group ...................................................................... 23

Figure 9: Import Prices of CCAs ($/kg) .................................................................... 35

Figure 10: European Export Prices of CCAs Versus US Import Prices ..................... 36

Figure 11: European Import Prices of CCAs Versus US Import Prices ...................... 37

Figure 12: Prices for Aluminum Compounds (Accelerator), Fatty Acids (Air Entrainer), & Synthetic Organic Plasticizers (Water Reducer)......................... 39

Figure 13: Price for Sodium Lignosulfonate (Plasticizer) ........................................ 40

Figure 14: Ocean Container Freight Rates.................................................................. 41

Figure 15: Timeline of Defendants' CCA Acquisitions ............................................. 48

Plaintiff 570 Concrete, LLC ("Plaintiff" or "570 Concrete"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to itself, and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to the federal antitrust laws and demands a trial by jury on all matters so triable.

## I.  NATURE OF THE ACTION

1.      This lawsuit arises from Defendants' unlawful agreement to fix the prices for: (a) concrete admixtures, (b) cement additives, (c) admixtures for mortar, and (d) products containing or bundled with any of the foregoing (collectively, "CCAs"). CCAs, which can be either in liquid or powdered form, are added to concrete, cement, and mortar before or during the aggregate's mixing with water in order to give the finished product certain qualities, such as reducing the amount of water needed for the aggregate to set, reducing (or increasing) set time, reducing shrinkage, stabilizing or preventing cracking, and inhibiting corrosion.[1] Globally, the market for CCAs reached more than $18 billion in 2020[2] and $27 billion in 2022.[3]

2.      Defendants—Sika AG and Sika Corporation (collectively, "Sika"); Chryso, Inc. ("Chryso") and GCP Applied Technologies, Inc. ("GCP"), under the ownership and control of Compagnie de Saint-Gobain S.A. and Saint-Gobain North America ("Saint-Gobain," and with Chryso and GCP, collectively "Saint-Gobain Group"); Master Builders Solutions Admixtures U.S., LLC, ("MBSA"), under the ownership and control of Master Builders Solutions Deutschland

---

[1]      The Constructor, 15 Types of Admixtures Used in Concrete, https://theconstructor.org/concrete/types-concrete-admixtures/5558/#:~:text=15.%20Coloring%20Admixtures%20%20%20Admixture%20%20,%20%20Green%20%203%20more%20rows%20.

[2]      Fortune Business Insights, Concrete Admixtures Market Size (Jan. 2020), https://www.fortunebusinessinsights.com/concrete-admixtures-market-102832.

[3]      Global News Wire, Concrete Admixture Market is Projected to reach US $27.5 Billion with a Share of 36.1%, by 2032 (July 13, 2022), https://www.globenewswire.com/en/news-release/2022/07/13/2479255/0/en/Concrete-Admixture-Market-is-projected-to-reach-US-27-4-Billion-with-a-Share-of-36-1-by-2032-Future-Market-Insights-Inc.html.

GmbH ("MBSD"), Cinven Ltd., and Cinven, Inc. ("Cinven," collectively "Master Builders Group"); and The Euclid Chemical Company ("Euclid"), under the ownership and control of RPM International Inc. ("RPM," and with Euclid, "Euclid Group")—manufacture and sell the vast majority of CCAs sold in the United States.

3.      Defendants' unlawful agreement caused direct purchasers of CCAs in the United States and its territories, including Plaintiff and the Class, to pay supra-competitive prices for CCAs sold by Defendants in the United States and its territories from the period beginning no later than May 11, 2018 and running through the date on which any Class herein is certified (the "Class Period"), in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). Defendants' scheme included both price increases and the imposition of surcharges on CCAs sold in the United States.

4.      Plaintiff and the Class first became aware of Defendants' unlawful scheme on October 17, 2023, when the European Commission ("EC") announced that it had, together with the United Kingdom's Competition and Markets Authority ("CMA") and the Turkish Competition Authority ("TCA"), carried out surprise antitrust inspections (also known as "dawn raids") of "companies active in the construction chemicals sector in several Member States."[4]

5.      That same day, the CMA released a statement that it had "launched an investigation . . . into suspected anti-competitive conduct relating to the supply of chemical admixtures and additives for use in concrete, cement, mortars and related construction products in the UK" and that its "investigation concern[ed] a suspected infringement or infringements of Chapter I [of the Competition Act of 1998] involving a number of suppliers of these chemicals and some industry

---

[4]      Press Release, European Comm'n, Commission Carries Out Unannounced Antitrust Inspections in the Construction Chemicals Sector (Oct. 17, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5061.

bodies."[5] According to the CMA, Chapter I of the Competition Act of 1998 "prohibits agreements and concerted practices between undertakings ([*e.g.*,] businesses) and decisions by associations of undertakings ([*e.g.*,] trade associations) which have as their object or effect the prevention, restriction or distortion of competition within the UK and which may affect trade within the UK."[6] Thus, Chapter I of the Competition Act of 1998 is the UK's equivalent to Section 1 of the Sherman Act.

6.      Both the EC and CMA have confirmed that they are working with the United States Department of Justice's Antitrust Division ("DOJ") in connection with these dawn raids, thus indicating that the anticompetitive conduct in question also extended into this country.[7]

7.      Shortly after these global antitrust enforcers announced their dawn raids, it was revealed that Sika, Saint-Gobain Group, and Master Builders Group are targets in this global antitrust investigation.[8] It was also revealed that Sika and Saint-Gobain Group are cooperating with these global antitrust authorities,[9] and that at least Sika had been in contact with the DOJ.[10]

8.      The origins of Defendants' conspiracy can be traced to 2014, when Compagnie de

---

[5]      Gov.UK, Suspected Anti-Competitive Conduct in Relation to the Supply of Chemicals for Use in the Construction Industry (Oct. 17, 2023), https://www.gov.uk/cma-cases/suspected-anti-competitive-conduct-in-relation-to-the-supply-of-chemicals-for-use-in-the-construction-industry.

[6]      CMA, Guidance on the Application of the Chapter Prohibition in the Competition Act 1998 to Horizontal Agreements 6 (2023).

[7]      Press Release, European Commission, Commission Carries Out Unannounced Antitrust Inspections in the Construction Chemicals Sector (Oct. 17, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5061; Construction News, Competition Regulators Probe Concrete Additive Firms (Oct. 19, 2023), https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/.

[8]      GCR, Sika, Saint-Gobain and Cinven-owned Business Targeted in Cross-Border Cartel Probe (Oct. 18, 2023), https://globalcompetitionreview.com/article/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe.

[9]      Construction News, Competition Regulators Probe Concrete Additive Firms (Oct. 19, 2023), https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/.

[10]      ICIS, EU, UK, Turkey Authorities Launch Construction Chems Antitrust Investigation (Oct. 18, 2023), https://www.icis.com/explore/resources/news/2023/10/18/10935016/eu-uk-turkey-authorities-launch-construction-chems-antitrust-investigation/.

Saint-Gobain S.A. launched a hostile takeover of Sika AG.[11] Over the next four years, Compagnie de Saint-Gobain S.A. attempted to consolidate its control of Sika AG, ultimately acquiring nearly a quarter of Sika AG's stock; however, on May 11, 2018, Compagnie de Saint-Gobain S.A. abandoned its takeover attempt, and agreed to reduce its stake to more than ten percent, which it agreed to hold for at least two years.[12] Before selling its Sika AG stock in 2020, Compagnie de Saint-Gobain S.A. was the largest shareholder in Sika AG.[13]

9.      The alleged conspiracy was born from this attempted merger. At the time it was launched, the market was ***already*** highly susceptible to collusion: the supply side was concentrated with high barriers to entry; the demand side was unconcentrated; and the demand for CCAs was inelastic. Sika AG and Compagnie de Saint-Gobain S.A., with their shared financial interest through Compagnie de Saint-Gobain S.A.'s significant financial stake in Sika AG, leveraged these susceptibilities and agreed to cease competing with one another in order to better ensure they both obtained higher prices for CCAs. This anticompetitive agreement, however, faced a problem: there were a handful of other, competing manufacturers of CCAs. Because these competitors were a threat to Compagnie de Saint-Gobain S.A. and Sika AG's agreement to charge higher prices for CCAs, the co-conspirators agreed to a joint, worldwide buying spree, ultimately purchasing no fewer than a half-dozen of their shared competitors between 2017 and the present. This agreement was aided and abetted at all times by Cinven, with Euclid Group thereafter joining the conspiracy.

---

[11]      Saint-Gobain Remains Committed to Deal to Take Over Sika, https://www.reuters.com/article/us-sika-cie-saint-gobain-idUSKBN1300II (last updated Nov. 6, 2016).

[12]      Market Watch, Saint-Gobain, Sika and Burkard Family End Dispute (May 11, 2018), https://www.marketwatch.com/story/saint-gobain-sika-and-burkard-family-end-dispute-2018-05-11; Saint-Gobain's U.S. Deal will Cement its Sika Envy, https://www.reuters.com/breakingviews/saint-gobains-us-deal-will-cement-its-sika-envy-2021-12-06/ (last updated Dec. 6, 2021).

[13]      VY Tyndall Global Select Fund Commentary, 5 (Oct. 2019), https://www.tyndallim.co.uk/wp-content/uploads/2019/11/1910-VT-Tyndall-Global-Select-Fund-Commentary.pdf; Saint-Gobain Sells Sika Stake, Formally Ending Bitter Takeover Battle, https://www.reuters.com/article/us-sika-m-a-saintgobain/saint-gobain-sells-sika-stake-formally-ending-bitter-takeover-battle-idUSKBN2331J1 (last updated May 27, 2020).

As Sika told investors in its 2022 Annual Report, it had "consolidate[d] fragmented [market segments]" to strengthen its core business.[14]

10.     Defendants' agreement became increasingly effective as they consolidated their market power, and prices for CCAs continued to rise. The onset of COVID in 2020, however, supercharged Defendants' conspiracy. With no meaningful check on their pricing power, Defendants agreed to institute (a) price increases on the CCAs, and (b) surcharges on top of those price increases, including shipping surcharges and raw material surcharges.

11.     Defendants have been secure in their knowledge that their competitors—the other Defendants—will not undercut them on price. For example, one industry analyst, in discussing at least the **third** price increase made by Sika in 2021,[15] stated, "They are not losing sales when increasing prices because competitors will also not sell at lower prices."[16] Similarly, Frank Sullivan, the Chairman, President, and CEO of RPM, admitted on an earnings call in July of 2023 that Euclid Group was charging too much for its CCAs but that the company (trusting that it would not be undercut on price) "held our pricing and held our discipline" and, as a result, reaped substantial supracompetitive profits on its CCAs.[17]

12.     Moreover, Defendants' claimed justification for these price hikes and surcharges is pretextual. The spike in raw material and shipping costs was either non-existent or short lived. In

---

[14]     Sika, Annual Report 2022, 13, https://www.sika.com/dms/getdocument.get/55534c2a-608c-4ec2-bc9f-df21d5ada6bd/glo-ar-2022-sika-business-year.pdf?_gl=1*t666q1*_ga*NTI2NDMwNTU0LjE2OTc2MzU0ODg.*_ga_K04G1QB2XC*MTY5NzgyODQ5Ni43LjEuMTY5NzgzMTU4OC4wLjAuMA..

[15]     Sika Raises Prices to Counter Jump in Raw Material Costs, https://www.reuters.com/article/sika-results-materials/sika-raises-prices-to-counter-jump-in-raw-material-costs-idUSZ8N1UN01Y (last updated Feb. 22, 2019) (noting price increases in January 2021 and March 2021).

[16]     Update 2-Chemicals Group Sika Tackles Higher Costs by Raising Prices, https://www.reuters.com/article/sika-results/update-2-chemicals-group-sika-tackles-higher-costs-by-raising-prices-idUSL4N2RI0XW (last updated Oct. 21, 2021).

[17]     Q4 2023 RPM International Inc. Earnings Call Transcript (July 26, 2023), https://www.rpminc.com/media/4837/rpm-q4-23-transcript.pdf .

comparison, Defendants' price increases, including surcharges, on CCAs have been both extreme and persistent.

13.    Defendants' conspiracy was facilitated through their shared membership in numerous trade associations. Specifically, some or all of the Defendants (or their affiliates) are members of numerous CCA trade associations around the World, providing ample opportunity to meet and conspire. These shared CCA trade associations include the Belgian CCA trade association, Federatie van Invoerders en Producenten van Hulpstoffen voor betons en mortels ("FIPAH");[18] the French CCA trade association, Syndicat National des Adjuvants pour Bétons et Mortiers ("SYNAD");[19] the Italian CCA trade association, Associazione Italiana Produttori Additivi e Prodotti per Cemento e Calcestruzzo ("ASSIAD");[20] the Norwegian Committee for Concrete Admixtures ("NCCA");[21] the Spanish CCA trade association, Asociación Nacional de Fabricantes de Aditivos para Hormigón y Mortero ("ANFAH");[22] the Swedish Association for Concrete Admixtures ("SACA");[23] the Turkish CCA trade association, Beton ve Harç Kimyasal Katkı Maddeleri Üreticileri Derneği ("KUB");[24] and the UK CCA trade association, Cement Admixtures Association ("CAA").[25] Notably, each of these CCA trade associations is also a member of an umbrella trade association: European Federation of Concrete Admixtures Association ("EFCA"). The EFCA describes itself as "a partnership of 13 National Admixture

---

[18]    FIPAH, Members, https://www.fipah.be/fr/membres/.

[19]    Synad, https://www.synad.fr/synad-syndicat-des-fabricants-d-adjuvants-beton-colorants-fibres.

[20]    ASSIAD, The Structure, https://www.assiad.it/LAssociazione/La-struttura?__cf_chl_rt_tk=u7pLurzdoe4b4m7JWGOf ds7HNRCC9lGE05zRTEktZi4-1700142619-0-gaNycGzNChA.

[21]    NCAA, https://ncca.no/.

[22]    ANFAH, Associate Members, https://anfah.org/anfah/miembros-de-anfah/.

[23]    SACA, Member Companies, https://www.saca.se/medlemmar.html.

[24]    KUB, About Us, https://kub.org.tr/hakkimizda/.

[25]    Cement Admixtures Association, Members, https://www.admixtures.org.uk/members

Associations, formed in 1984 in order to represent the interests of the industry. . . . EFCA's total membership provides in excess of 80% of admixture sales within Europe and represents all the major admixture manufacturers."[26]

14.     And in the United States, Defendants are "super sponsors" of the National Ready-Mix Concrete Association ("NMRCA"), a trade association founded in 1930, long before most of the construction chemicals at issue came into existence. While many of NMRCA's members are buyers who bought CCAs directly from Defendants and thus were harmed by Defendants' anticompetitive conduct, the NMRCA, even if not a co-conspirator, provided Defendants with yet a further opportunity to meet and collude among themselves under the guise of participation in a legitimate trade association. The NMRCA also provided Defendants with benchmarking analyses that Defendants could misuse to further their efforts to fix CCA prices.

15.     In sum, beginning no later than May 11, 2018, Defendants entered into an agreement to consolidate their control over the global manufacture of CCAs and charge supracompetitive prices for CCAs through price increases and the imposition of surcharges. This agreement, which was effectuated through Defendants' shared membership in numerous trade associations, resulted in Plaintiff and members of the Class paying supra-competitive prices for CCAs in the United States and its territories. Through this action, Plaintiff, on behalf of itself and members of the Class, seeks to recover the overcharges they paid to Defendants.

## II.     <u>JURISDICTION AND VENUE</u>

16.     Plaintiff brings this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such

---

[26]     EFCA, About Us, https://www.efca.info/about-us/.

other relief as is afforded under the antitrust laws of the United States and its territories for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

18.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

## III.   PARTIES AND UNNAMED CO-CONSPIRATORS

### A.   Plaintiff

19.     Plaintiff, 570 Concrete, is a business incorporated in the State of Pennsylvania with its primary place of business at 600 Glenn Street, Scranton, PA 18509.

20.     During the Class Period, Plaintiff purchased CCAs in the United States or its territories at supra-competitive prices directly from one or more of the Defendants.

### B.   Defendants

#### 1.   Sika

21.     Defendant Sika AG is a Swiss corporation with its primary place of business at Zugerstrasse 50 Baar, Zug, 6341 Switzerland. During the Class Period, Sika AG manufactured and sold CCAs around the World, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries, including Defendant Sika Corporation.

22.     Defendant Sika Corporation is a New Jersey corporation with its primary place of business at 201 Polito Ave Lyndhurst, New Jersey, 07071. Sika Corporation has approximately thirty-six (36) locations throughout North America, including twenty-eight (28) in the United

States and three (3) in this District.[27] During the Class Period, Sika Corporation manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

23.     Sika Corporation is a wholly owned subsidiary of Sika AG. Sika AG controls Sika Corporation both generally and with respect to the conduct of Sika Corporation in furtherance of the unlawful acts alleged in this Complaint.

24.     Sika AG and Sika Corporation are collectively referred to herein as "Sika."

### 2.     *Saint-Gobain Group*

25.     Defendant Compagnie de Saint-Gobain S.A. is a French corporation with its primary place of business at Tour Saint Gobain,12 Place De L Iris Courbevoie, Ile-De-France, 92400 France. During the Class Period, Saint-Gobain Group manufactured and sold CCAs around the World, including in the United States and its territories, both directly and through its predecessors, affiliates, and/or subsidiaries, including Saint-Gobain North America, Chryso, and GCP.

26.     Defendant Saint-Gobain North America is a Pennsylvania corporation with its primary place of business at 20 Moores Rd., Malvern, Pennsylvania, 19355. Saint-Gobain North America has approximately 150 locations throughout North America, including 106 in the United States, four (4) of which are in this District.[28] During the Class Period, Saint-Gobain North America manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

27.     Defendant Chryso is a Michigan corporation with its primary place of business at

---

[27]     SIKA, Locations, https://usa.sika.com/en/about-us/sika-usa-locations.html.

[28]     Saint-Gobain, Manufacturing Sites, https://www.saint-gobain-northamerica.com/manufacturing-sites.

1611 Highway 276, Rockwall, TX 75032. With over 1,300 staff worldwide, Chryso has twenty-two (22) foreign subsidiaries and serves customers in more than one hundred (100) countries,[29] including four (4) in the United States.[30] During the Class Period, Chryso manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

28.    Defendant GCP is a Georgia corporation with its primary place of business at 2325 Lakeview Parkway, Suite 450 Alpharetta, GA 30009. GCP employs roughly 2,400 people in more than 40 countries, serving customers in more than 110 countries, including in the United States.[31] During the Class Period, GCP manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

29.    Saint-Gobain North America, Chryso, and GCP are wholly owned subsidiaries of Compagnie de Saint-Gobain S.A., which controls Saint Gobain North America, Chryso, and GCP both generally and with respect to their conduct in furtherance of the unlawful acts alleged in this Complaint.

30.    Compagnie de Saint-Gobain S.A., Saint-Gobain North America, Chryso, Inc., and GCP Applied Technologies, Inc. are collectively referred to herein as "Saint-Gobain Group."

### 3.    Master Builders Group

31.    Defendant Cinven Ltd. is a British corporation with its primary place of business at 21 St. James's Square, London, SW1Y 4JZ, United Kingdom. Cinven Ltd. manufactures and sells CCAs around the World, including in the United States and its territories, through its predecessors, affiliates, or subsidiaries, including Cinven, Inc., MBSD, and MBSA.

---

[29]    Cement Admixtures Association, Members, https://www.admixtures.org.uk/members/.

[30]    CHRYSO, Inc. LinkedIn Profile, https://www.linkedin.com/company/chryso-inc/about/.

[31]    GCP Applied Technologies, Locations, https://ca.gcpat.com/en/about/locations.

32.     Defendant Cinven, Inc. is a New York corporation with its primary place of business at Tower 49, 12 East 49th Street, New York, NY 10017.[32] Cinven Inc. manufactures and sells CCAs around the World, including in the United States and its territories, through its predecessors, affiliates, or subsidiaries, including MBSA. Defendants Cinven Ltd. and Cinven Inc. are collectively referred to herein as "Cinven."

33.     Defendant MBSD is a German corporation with its primary place of business at Glücksteinallee 43-45, 68163 Mannheim, Germany. During the Class Period, MBSD manufactured and sold CCAs around the World, including in the United States and its territories, both directly and through its predecessors, affiliates, or subsidiaries, including MBSA. Indeed, the CEO of MBSA, Borris Gorella, is the Managing Director of MBSD's parent company, Master Builders Solutions Holdings GmbH.

34.     Defendant MBSA is a Delaware corporation with its primary place of business at 23700 Chagrin Blvd., Beachwood, Ohio, 44122. MBSA has approximately three (3) locations throughout North America, including two (2) in the United States.[33] During the Class Period, MBSA manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

35.     MBSD and MBSA are wholly owned subsidiaries of Cinven. Cinven controls MBSD and MBSA both generally and with respect to the conduct of MBSD and MBSA in furtherance of the unlawful acts alleged in this Complaint.

36.     MBSD, MBSA, and Cinven are collectively referred to herein as "Master Builders Group."

---

[32]      Cinven, Locations, https://www.cinven.com/site-tools/cinven-offices.

[33]      Master Builders Solutions, Our Locations, https://www.master-builders-solutions.com/about-us/our-locations.

####    4.    *Euclid Group*

37.    Defendant Euclid is an Ohio corporation with its primary place of business at 19215 Redwood Rd, Cleveland, Ohio 44110. Euclid has approximately twenty-eight (28) locations in North America, including twenty-one (21) locations in the United States, one of which is in this District.[34] During the Class Period, Euclid manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

38.    Defendant RPM is a Delaware corporation with its primary place of business at 2628 Pearl Road, Medina, Ohio 44256. During the Class Period, RPM manufactured and sold CCAs around the World, including in the United States and its territories, both directly and through its predecessors, affiliates, or subsidiaries, including Euclid.

39.    Euclid is a wholly owned subsidiary of RPM. RPM controls Euclid both generally and with respect to the conduct of Euclid in furtherance of the unlawful acts alleged in this Complaint.

40.    Euclid and RPM are collectively referred to herein as "Euclid Group."

####    5.    *Doe Defendants*

41.    Doe Defendants 1-10 are members of the price-fixing conspiracy alleged herein whose identities are presently unknown to Plaintiff. These include, among other entities, the various "industry bodies" referenced in the CMA's statement regarding its investigation. Plaintiff expects that the identity of these Doe Defendants will be revealed during discovery, at which point Plaintiff will seek leave to amend its complaint to add those entities in place of the Doe Defendants.

###    C.    <u>Agents and Unnamed Co-Conspirators</u>

42.    The acts alleged against the Defendants in this Complaint were authorized, ordered,

---

[34]    The Euclid Group, Locations, http://12.43.214.238/locations.

or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

43.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

44.     Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## IV.     FACTUAL ALLEGATIONS

### A.     CCAs Generally

#### 1.     CCAs Are an Essential Input in Cement, Concrete, and Mortar

45.     CCAs are added to cement, concrete, and mortar to improve their safety and functionality.

46.     Concrete is an important resource for all kinds of construction projects in the United States and its territories. Just over half of the low-rise (less than three-stories in height) structures in the United States and its territories are built out of concrete.[35]

47.     Cement is a binding agent made from limestone and clay and is also used extensively in building in the United States. Cement production in the United States and its territories reached its highest level in more than a decade in 2022, amounting to 95 million metric tons.[36]

48.     Mortar is a combination of cement and sand and is primarily used to hold ready-made building units (like bricks or blocks) in place.

---

[35]     PCA, Buildings & Structures, https://www.cement.org/cement-concrete/paving/buildings-structures.

[36]     Statista, Apparent Cement Consumption in the U.S. from 2010 to 2022 (Oct. 30, 2023), https://www.statista.com/statistics/273367/consumption-of-cement-in-the-us/.

49.   **Figure 1**, below, illustrates the differences and uses of concrete, cement, and mortar:[37]



Figure 1: Cement vs. Concrete vs. Mortar

50.   CCAs are integral to the construction of America's infrastructure, including residential, commercial, and industrial buildings, roads, bridges, tunnels, and airports.[38] Indeed, the CMA recently concluded that CCAs are "an essential input in the production" of cement, concrete, and mortar.[39]

---

[37]   The Spruce, Differences Between Cement, Concrete, and Mortar, https://www.thespruce.com/thmb/r3NjpAf8yDRYLArSXx2BX2iwcOM=/1500x0/filters:no_upscale():max_bytes(150000):strip_icc()/difference-between-cement-concrete-and-mortar-2130884-final-ac-5c1aa0e546e0fb0001909553-fd07f31197cd491e85bf0eb8200f6f5e.png.

[38]   International Association of Certified Home Inspectors, Concrete Admixtures, https://www.nachi.org/concrete-admixtures.htm.

[39]   CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 4 (Sept. 23, 2022).

51.     The essential nature of CCAs is shown in **Figure 2**, below, from Saint-Gobain:[40]

### Figure 2: How CCAs Are Used



52.     Due to their essential nature, the vast majority of projects using concrete, cement, and/or mortar also use CCAs.

### 2.     *Types of CCAs*

53.     As noted above, CCAs include (a) concrete admixtures, (b) cement additives, and (c) admixtures for mortar. The CMA has described the uses for each as follows:

> Chemical admixtures for cement are added to cement in order to reduce the amount of energy required to grind the cement (ie grinding aids) as well as to improve the performance of the cement (ie performance enhancers or quality improvers);
>
> Chemical admixtures for concrete are added to improve the

---

[40]     Joana Alberto, LinkedIn Post (2022), https://www.linkedin.com/posts/joana-alberto_constructionchemestry-solutions-decarbonazation-activity-6940612387087503360-sqzk/?utm_source=share&utm_medium=member_desktop.

properties of concrete or wet mortar, including super-plasticizers, plasticizers, air entrainers, retarders and accelerators; and

Other chemical admixtures include admixtures for dry mortar and certain admixtures for wet mortar that are not also used for concrete, for example as they increase the adhesion properties of mortar but do not reduce the amount of water required.[41]

54.    Manufacturers of CCAs use the same equipment and chemicals to produce these CCAs, so they can quickly and cost-effectively shift production from one category of CCA to another.[42] On the other hand, purchasers of CCAs do ***not*** view these products as interchangeable, nor do purchasers view there as being substitutes for CCAs.

55.    The American Society for Testing and Materials ("ASTM") identifies seven primary types of CCAs, based on the qualities they add to the aggregate material: (a) Type A—water reducing (plasticizer); (b) Type B—retarding; (c) Type C—accelerating; (d) Type D—water reducing and retarding; (e) Type E—water reducing and accelerating; (f) Type F—water reducing, high range ("HRWR," or superplasticizer); and (g) Type G—water reducing, high range, and retarding.[43] The ASTM also recognizes several other admixture types, including those that have air entraining (to enhance compressive or flexural strength of concrete), and cold weather setting properties.

56.    The various types of CCAs are shown in **Figure 3**, below:[44]

---

[41]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, FN 57 (Sept. 23, 2022).

[42]    *Id.*

[43]    ASTM, Standard Specification for Chemical Admixtures for Concrete, https://www.astm.org/c0494_c0494m-17.html (last updated Mar. 10, 2020).

[44]    *Id.*; ASTM, Standard Specification for Air-Entraining Admixtures for Concrete, https://www.astm.org/c0260_c0260m-10ar16.html (last updated Dec. 27, 2016); ASTM, Standard Specification for Admixtures to Inhibit Chloride-Induced Corrosion of Reinforcing Steel in Concrete, https://www.astm.org/c1582_c1582m-11r17e01.html (last updated July 28, 2017); ASTM, Standard Specification for Cold-Weather Admixture Systems, https://www.astm.org/c1622_c1622m-10r16e01.html (last updated Dec. 27, 2016); ASTM, Standard Specification for Pigments for Integrally Colored Concrete, https://www.astm.org/c0979_c0979m-16.html (last updated Dec. 27, 2016); Concrete Network, Admixtures by Classification, https://www.concretenetwork.com/photo-gallery/site_26/chris-sullivan_14351/.

| ASTM Code | Use | Active Ingredient(s)[45] |
|---|---|---|
| C494 Type A | Water Reducing (*i.e.*, reduce the water required to achieve a given consistency) | Lignosulfonates; Hydroxylated carboxylic acids; Melamine sulfonate; Phosphonate salts; Naphthalene sulfonate |
| C494 Type B | Retarding (*i.e.*, delay setting) | Amino Trimethylene Phosphonic Acid ("ATMP") |
| C494 Type C | Accelerating (*i.e.*, speed up the setting and early strength development) | Calcium chloride; Triethanolamine; Aluminum hydroxide; Aluminum sulfate; Calcium nitrite; Oxalic acid; Sodium thiocyanate; Sodium thiosulfate; Calcium formate; Silica fume; Silica gel |
| C494 Type D | Water Reducing & Retarding | *See* Type A & Type B |
| C494 Type E | Water Reducing & Accelerating | *See* Type A & Type C |
| C494 Type F | Water Reducing & High Range ("Superplasticizer" "HRWR") | Polyether alcohols |
| C494 Type G | Water Reducing, High Range, & Retarding | *See* Type B & Type F |
| C260 | Air Entraining (*i.e.*, improved durability, compressive and flexural strength) | Salts of wood resins; Some synthetic detergents; Salts of sulfonated lignin; Salts of petroleum acids; Salts of proteinaceous material; Fatty and resinous acids and their salts; Alkydbenzene sulfonates; Fatty alcohols and other surfactants |
| C618 | Reduce costs; improve workability and plasticity | Natural Pozzolans; Fly ash |

**Figure 3: Types of CCAs, By ASTM Code**

---

[45]     Bisley International, Raw Materials for Concrete Admixture, https://bisleyinternational.com/raw-materials-for-concrete-admixture.

17

| C494 Type S | Water Repelling (*i.e.*, decrease permeability of finished concrete surface) | Stearate of calcium, aluminum, ammonium, or butyl; Petroleum greases or oils; Soluble chlorides |
|---|---|---|
| C1582 | Corrosion Inhibiting | Calcium nitrite<br><br>Lithium nitrate |
| 1622 | Cold Weather Setting | Sodium nitrite |

57.    As **Figure 3** shows, CCAs are made by blending polymers and other chemicals together. These raw materials can be difficult to manufacture, as they require specialized facilities and significant research and development. Whereas Defendants research, develop, and manufacture at least some of these polymers in-house (though they also purchase polymers from third parties),[46] smaller manufacturers of CCAs source these polymers exclusively from third parties.

58.    In recent years, there has been a reported shortage in the polymers necessary to manufacture CCAs, thus giving Defendants (who produce at least some of their own polymers in-house) a competitive advantage over smaller manufacturers of CCAs.[47] However, as set forth in greater detail herein, the alleged shortage in these polymers does not and cannot fully explain Defendants' huge price increases and surcharges for CCAs that they implemented during the Class Period.

### 3.    *How CCAs Are Sold and Who Buys Them*

59.    Most CCAs are sold in ready-to-use liquid form and can be added to the cement, concrete, or mortar either at the plant where it is produced (*e.g.*, ready-made concrete mix) or at

---

[46]    CMA, Decision on Relevant Merger Situation and Substantial Lessening of Competition, ¶ 88 (Sept. 22, 2022).

[47]    *Id.*

the jobsite where it is to be used.[48]

60.     An example of how CCAs are packaged and sold is shown in **Figure 4**, below:[49]

### Figure 4: Picture of SikaMix AE-6 Packaging



61.     Purchasers of CCAs operate in the construction and industrial sectors and include producers of ready-mixed concrete, shotcrete,[50] and pre-cast concrete.[51] Purchasers of CCAs typically purchase the majority of their CCAs from a single supplier.[52]

62.     In general, CCAs are sold by Defendants directly to suppliers of ready-mix concrete and masonry, as well as through distributors.

---

[48]     Sika,   Corporate   Governance   (2022),   https://www.sika.com/dam/dms/corporate/media/glo-ar-2022-corporate-governance.pdf.

[49]     Sika USA, SikaMix AE-6, https://usa.sika.com/en/construction-products/concrete/concrete-admixtures/dry-cast-admixtures/efflorescence-control/sikamix-ae-6.html; *see also* Master Builders Solutions, Concrete Admixtures, https://www.master-builders-solutions.com/en-us/products/concrete-admixtures; CHRYSOQuad, Lower Quality Sands: Impact Concrete Performance and Placement, https://www.chrysoinc.com/solutions/chrysoquad/; Sika USA, A Complete Range of Concrete Admixtures, https://usa.sika.com/en/construction/concrete/concrete-admixtures.html.

[50]     Shotcrete (or gunite) is a type of ready-mixed concrete that, instead of being poured and spread, is fed through a hose and applied using a high-pressure sprayer. It is typically used for concrete walls, such as in tunnels.

[51]     Sika USA, A Complete Range of Concrete Admixtures, https://usa.sika.com/en/construction/concrete/concrete-admixtures.html.

[52]     CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 49 (Sept. 23, 2022).

19

**B.**     **The Market for CCAs in the United States and Its Territories**

63.     The United States and its territories are a large market for CCAs, at roughly $3 billion per year.[53] Roughly $100 million is imported into the United States each year.[54]

64.     Defendants are the dominant manufacturers and sellers of CCAs in the World, and in the United States and its territories. On information and belief, Plaintiff's estimate of Defendants' market share in the United States is between eighty and ninety percent (80% to 90%)[55]

65.     Defendants manufacture and sell numerous CCAs in the United States and its territories, as well as around the World. Purchasers of CCAs in the United States and its territories import them directly from the foreign Defendants (*e.g.*, Compagnie de Saint-Gobain S.A., Sika AG, and MBSD) and buy them from their domestic subsidiaries (*e.g.*, Sika Corp., Chryso, GCP, and MBSA).[56] The below figures list some of the CCAs sold in the United States and its territories by Defendants.

---

[53]     Mordor Intelligence, North America Concrete Admixtures Market Size & Share Analysis – Growth Trends & Forecasts 2023 – 2028, https://www.mordorintelligence.com/industry-reports/north-america-concrete-admixtures-market.

[54]     U.S. International Trade Commission, U.S. Imports for Consumption HTS6 3824.40, https://hts.usitc.gov/search?query=6%20382440.

[55]     CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 75 (Sept. 23, 2022).

[56]     CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 124(b) (Sept. 23, 2022).

66.    **Figure 5** lists some of the CCAs sold by Sika in the United States and its territories:

| *Figure 5: CCAs Sold by Sika* | | | |
|---|---|---|---|
| Chromix | SikaMultiAir | SikaViscoFlow | SikaMix |
| SikaAEA | SikaPlastiment | Sika Watertight Concrete Powder | SikaPlast |
| SikaAir | SikaPlastocrete | SikaWT | SikaQuick Winter Boost |
| SikaAntisol | SikaRapid | SikaColor | SikaSet |
| SikaCem | SikaRugasol | SikaControl | SikaTard |
| SikaCem Summer Extender | SikaSigunit | Sikacrete | SolarChrome |
| SikaCNI | SikaStabilizer | Sikament | ViscoCrete |
| SikaGrind | Sika FerroGard | Sika Lightcrete Powder | Sika Lightcrete Liquid |

67.    **Figure 6** shows some of the CCAs sold by Saint-Gobain Group in the United States

and its territories:

| *Figure 6: CCAs Sold by Saint-Gobain Group* | | | |
|---|---|---|---|
| **Chryso** | | | |
| CHRYSO Air | CHRYSO Aqua | CHRYSO CI | CHRYSO Control |
| CHRYSO DSF | CHRYSO Dust Suppressant | CHRYSO EnviroMix | CHRYSO Fluid ProPel |
| CHRYSO Fluid Optima | CHRYSO Fluid Premia | CHRYSO NutralSet | CHRYSO Optima |
| CHRYSO Optifinish | CHRYSO PoreTite | CHRYSO Plast | CHRYSO Premia |
| CHRYSO Quad | CHRYSO Quad EMx | CHRYSO Serenis | CHRYSO Tard |
| CHRYSO TurboCast | -- | -- | -- |

| GCP | | | |
|---|---|---|---|
| Adva | Daratard | Force | RDA |
| Airalon | Daravair | Hydrophobe | Recover |
| Clarena | Darex | Mira | Synchro |
| Daraccel | DCI | Optec | Tavero |
| Daracem | Dry-Block Admixture | Polarset | Terapave |
| DaraFill | Dry-Block Mortar Admixture | Postrite | Tyronix |
| Darapel | Eclipse | Quantec | Tytron |
| Daraset | FXP | Rasir | V-Mar |
| WRDA | Zyla | -- | -- |

68.     **Figure 7** shows some of the CCAs sold by Master Builders Group in the United States and its territories:

| Figure 7: CCAs Sold by Master Builders Group | | | |
|---|---|---|---|
| MasterAir | MasterGlenium | MasterPolyheed | MasterSet |
| MasterCast | MasterLife | MasterPozzolith | MasterSure |
| MasterCell | MasterMatrix | MasterRheobuild | Master X-Seed |
| MasterColor | MasterPel | --- | --- |

22

69.     **Figure 8** shows some of the CCAs sold by Euclid Group in the United States and its territories:

| Figure 8: CCAs Sold by Euclid Group | | | |
|---|---|---|---|
| Accelguard | Eucon Barracade | Eucon MRX | Eucon Retarder |
| Conex | Eucon BCN | Eucon NR | Eucon WRX |
| Eucon 37 | Eucon CIA | Eucon NW | Eucon X |
| Eucon 1037 | Eucon DS | Eucon SE | Eucon SRA |
| Eucon 537 | Eucon Easy Fill | Eucon SP | Eucon Stasis |
| Eucon A+ | Eucon Integral ARC | Eucon Sureshot | Eucon WR |
| Eucon ABS | Eucon LR | Eucon Vandex | Plastol |
| Eucon Air | Eucon LW | Eucon WO | Visctrol |
| Eucon AWA | Eucon MR | -- | -- |

**C.     Global Antitrust Investigations into Defendants' Anticompetitive Conduct**

70.     On October 17, 2023, the EC announced that it had carried out dawn raids at several firms active in the construction chemicals industry in connection with suspected cartel conduct:

On 17 October 2023, the European Commission carried out unannounced inspections at the premises of companies active in the concrete chemical admixture industry in various Member States.

The inspections concern possible collusion in relation to the supply of chemical product ingredients that are added to cement, concrete and mortar to modify and improve their properties and provide them with specific qualities.

The Commission has concerns that companies in the concrete chemical admixture industry worldwide *may have violated EU antitrust rules that prohibit cartels and restrictive business practice*s (Article 101 of the Treaty on the Functioning of the European Union).

23

The EC said its inspections "were conducted in coordination with the UK CMA and the Turkish Competition Authority", adding that it had also been in contact with the US Department of Justice's Antitrust Division.[57]

71.     The EC was accompanied by its counterparts from the national competition authorities of the European Union Member States where the inspections were carried out.[58]

72.     That same day, the CMA confirmed its participation in the investigation and named Sika, Saint-Gobain Group, and Master Builders Group as the subject of that investigation:

> The CMA has reason to suspect **anti-competitive behaviour has taken place involving suppliers of chemical admixture and products containing CCA for use in the manufacture of consumer products such as household and personal care products**.
>
> The businesses under investigation by the CMA are: Sika AG, **Sika Corporation**, Saint-Gobain Group, **Saint-Gobain North America**, Master Builders Construction Chemicals Group, **Master Builders Solutions Admixtures US, LLC**, Cinven Group LTD, and Cinven Group LTD.
>
> The CMA has been in contact with the Antitrust Division of the US Department of Justice, the European Commission and the Turkish Competition Authority in relation to this matter, and this investigation has been launched in consultation with them.[59]

73.     The EC, CMA, and TCA confirmed their involvement in the investigation and provided further details regarding the conduct they were investigating:

> The European Commission opened an investigation into antitrust violations at construction chemical operations. There are suspicions that producers have colluded.
>
> **The CMA has indications that there is anticompetitive conduct between a "number of suppliers" and "some industry bodies" in violation of cartel law.** The searches come five months after chemical admixture supplier Sika completed its proposed £4.5 billion acquisition of rival [Master Builders]

---

[57]     Construction News, *Competition Regulators Probe Concrete Additive Firms* (Oct. 19, 2023), https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/ (emphasis added).

[58]     GCR, *Sika, Saint-Gobain and Cinven-owned Business Targeted in Cross-Border Cartel Probe* (Oct. 18, 2023), https://globalcompetitionreview.com/article/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe (emphases added).

[59]     Gov.UK, *Suspected Anti-Competitive Conduct in Relation to the Supply of Chemicals for Use in the Construction Industry* (Oct. 17, 2023), https://www.gov.uk/cma-cases/suspected-anti-competitive-conduct-in-relation-to-the-supply-of-chemicals-for-use-in-the-construction-industry (emphasis added).

Group. ***There are suspicions that these undertakings have coordinated their pricing policy, prohibited their competitors from supplying certain customers and limited the production of essential ingredients used in the production of concrete, mortar and cement.*** The undertakings involved in the investigation are Sika AG, Sika Corporation (USA), Saint-Gobain North America (USA), Master Builders Construction Chemicals Group, Master Builders Solutions Admixtures US, LLC (USA), Cinven LTD, and Cinven Group LTD.

Dawn raids were conducted at various locations. These were carried out in consultation with other competition authorities, namely the European Commission, the US Department of Justice Antitrust Division, the Turkish Competition Authority, and the UK Competition and Markets Authority.[60]

74.      Sika, Saint-Gobain Group, and Master Builders Group have all confirmed that they are subjects of the investigation, as set forth below.[61]

75.      On October 18, 2023, Sika confirmed the investigation in a statement to Construction News ("CN"): Sika confirmed to CN that inspections had taken place into "suspected antitrust irregularities in the area of additives for concrete and cement," adding that "[t]he fair operations of the markets is fundamental to Sika and we support this investigation with all our efforts and cooperate fully with the authorities."[62]

76.      On October 18, 2023, Saint-Gobain Group confirmed its cooperation in an email: "We can confirm that Saint-Gobain is aware of competition law investigations and cooperating with these investigations."[63]

---

[60]      ICIS, EU, UK, Turkey Authorities Launch Construction Chems Antitrust Investigation (Oct. 18, 2023), https://www.icis.com/explore/resources/news/2023/10/18/10935016/eu-uk-turkey-authorities-launch-construction-chems-antitrust-investigation/ (emphases added).

[61]      GCR, Sika, Saint-Gobain and Cinven-owned Business Targeted in Cross-Border Cartel Probe (Oct. 18, 2023), https://globalcompetitionreview.com/article/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe.

[62]      Construction News, Competition Regulators Probe Concrete Additive Firms (Oct. 19, 2023), https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/.

[63]      Nasdaq, St Gobain says Cooperating in EU Probe into Construction Chemicals Cartel, https://www.nasdaq.com/articles/st-gobain-says-cooperating-in-eu-probe-into-construction-chemicals-cartel (last updated Oct. 18, 2023).

77.    That same day, Master Builders Group confirmed the investigation by the EC.[64]

78.    The inspections by the EC were not undertaken casually. Inspections are typically done by an order of the EC, and the EC must have "reasonable grounds for suspecting an infringement of the competition rules;" "[i]t must be borne in mind that the inspections carried out by the Commission are intended to enable it to gather the necessary documentary evidence to check the actual existence and scope of a given factual and legal situation concerning which it already possesses certain information."[65]

79.    The same is true for the TCA. Earlier this year, the Turkish Constitutional Court, the highest legal body for constitutional review in Turkey, held that the TCA may conduct a dawn raid after first obtaining a search warrant from a Turkish criminal court.[66]

80.    This investigation follows several years in which the Defendants have generally increased their profits while also imposing price increases and surcharges that are not adequately explained by other competitive factors.

81.    These increases in profits during the Class Period are inconsistent with the Defendants' pretextual explanation that their price increases were intended to offset rising costs and are more consistent with the existence of a conspiracy to fix prices.

### D.    Defendants Effectuated Their Conspiracy Through Their Shared CCA Trade Associations

82.    In announcing the coordinated dawn raids, the CMA stated that the anticompetitive conduct at issue included not only individual companies, but also "some industry bodies." This is

---

[64]    GCR, Sika, Saint-Gobain and Cinven-owned Business Targeted in Cross-Border Cartel Probe (Oct. 18, 2023), https://globalcompetitionreview.com/article/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe.

[65]    Case No. T-135/09, *Nexans France SAS v. Comm'n*, 2012 E.C.R. 43.

[66]    Lexology, A New Era for the On-Site Inspections by the TCA (Aug. 23, 2023), https://www.lexology.com/library/detail.aspx?g=31016b1d-6615-4bb5-ad85-9a8fd9db3ecf.

hardly surprising, given that Defendants share membership in a multitude of CCA trade associations around the World. This gave Defendants ample opportunity to meet and conspire in furtherance of their agreement to fix prices for CCAs.

83.     Defendants Sika, Saint-Gobain Group, and Master Builders Group are members of the following shared trade associations: (a) the Belgian CCA trade association, FIPAH;[67] (b) the French CCA trade association, SYNAD;[68] (c) the Italian CCA trade association, ASSIAD;[69] (d) the Norwegian CCA trade association, NCCA;[70] (e) the Spanish CCA trade association, ANFAH;[71] (f) the Swedish CCA trade association, SACA;[72] (g) the Turkish CCA trade association, KUB;[73] and (h) the UK CCA trade association, CAA.[74] Euclid is also a member of KUB.[75] Each of these trade associations also belongs to an umbrella CCA trade association: EFCA.

84.     **EFCA.** EFCA describes itself as "a partnership of 13 National Admixture Associations, formed in 1984 in order to represent the interests of the industry."[76] EFCA's membership "provides in excess of 80% of admixture sales within Europe and represents all the major admixture manufacturers."[77]

85.     The current EFCA Executive Board is made up of President Gianluca Bianchin, Vice Presidents Thomas Hirschi and Osman Ilgen, Sustainability Committee Chair Nihal

[67]     FIPAH, Members, https://www.fipah.be/fr/membres/.

[68]     Synad, https://www.synad.fr/synad-syndicat-des-fabricants-d-adjuvants-beton-colorants-fibres.

[69]     ASSIAD, The Structure, https://www.assiad.it/LAssociazione/La-struttura.

[70]     NCAA, Welcome, https://ncca.no/.

[71]     ANFAH, Associate Members, https://anfah.org/anfah/miembros-de-anfah/.

[72]     SACA, Member Companies, https://www.saca.se/medlemmar.html.

[73]     KUB, About Us, https://kub.org.tr/hakkimizda/.

[74]     Cement Admixtures Association, Members, https://www.admixtures.org.uk/members/.

[75]     KUB, About Us, https://kub.org.tr/hakkimizda/.

[76]     EFCA, About Us, https://www.efca.info/about-us/.

[77]     *Id.*

Kinnersley, and Technical Committee Chair Francesco Surico.[78] Thomas Hirschi has worked at Sika since July of 2001 and has served as "Target Market Manager Concrete Waterproofing" for the company since January of 2017.[79] Osman Ilgen was Managing Director at Chryso from March of 2015 through September of 2023 and has been a Vice President at Saint-Gobain Group since January of 2023.[80] He also currently serves as President of KUB.[81] Nihal Kinnersley has worked as a Product Stewardship Manager at GCP since March of 2016 and as a Product Stewardship Director at Saint-Gobain Group since July of 2023.[82]

86.     Other members of the ECFA Board include Kai Salo of Sika, Claude Le Fur, who worked at Sika until July of 2021, and Suat Seven of Master Builders Group.[83]

87.     Members of the EFCA Technical Committee include Ian Ellis, who worked at Master Builders Group until July of 2022, Marko Kaisanlahti of Master Builders Group, Franz Wombacher of Sika, Trond Solbo of Sika, Osman Tezel of Saint-Gobain Group, Jean-Philippe Bigas of Saint-Gobain Group, and Robert Hurkmans of Saint-Gobain Group.[84]

88.     Members of the EFCA Environmental Committee (which is also referred to as the Sustainability Committee) include Marko Kaisanlahti of Master Builders Group, Maxime Julliot

---

[78]     EFCA, Structure, https://www.efca.info/about-us/efca-structure/.

[79]     Thomas Hirschi, LinkedIn Profile, https://www.linkedin.com/in/thomas-hirschi-01159b83/?originalSubdomain=ch.

[80]     Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr.

[81]     Id.

[82]     Nihal Kinnersley, LinkedIn Profile, https://www.linkedin.com/in/nihal-kinnersley-ba506b22/?originalSubdomain=uk.

[83]     EFCA, Committees, https://www.efca.info/efca-committees/; Kai Salo, LinkedIn Profile, https://www.linkedin.com/in/kai-salo-72384880/?originalSubdomain=fi; Claude Le Fur, LinkedIn Profile, https://www.linkedin.com/in/claude-le-fur-a4735857/?originalSubdomain=fr; Suat Seven, LinkedIn Profile, https://www.linkedin.com/in/suat-seven-b9a7403a/?originalSubdomain=tr.

[84]     EFCA, Committees, https://www.efca.info/efca-committees/; Ian Ellis, LinkedIn Profile, https://www.linkedin.com/in/ian-ellis-72a94115/?originalSubdomain=uk; Marko Kaisanlahti, LinkedIn Profile, https://www.linkedin.com/in/marko-kaisanlahti-28ab2b116/?originalSubdomain=fi; Franz Wombacher, LinkedIn Profile, https://www.linkedin.com/in/franz-wombacher-9888b941/?originalSubdomain=ch; Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr; Sika Norway, Technical Department/Environment/QEHS, https://nor.sika.com/no/teknisk-avdeling.html; Jean Philippe Bigas, LinkedIn Profile, https://www.linkedin.com/in/jean-philippe-bigas-658a07b5/?originalSubdomain=fr; CHRYSO, Saint-Gobain Weber Beamix Enlarges its Offering in the Netherlands with Weber Cemfloor Screed and Chryso Concrete Admixtures (June 9, 2023), https://www.chryso.com/news/saint-gobain-weber-beamix-enlarges-its-offering-in-the-netherlands-with-weber-cemfloor-screed-and-chryso-concrete-admixtures/.

of Master Builders Group, Mark Schneider, who worked for Sika until October of 2022, Bjorn

Stockmann of Sika, Anders Larsson of Sika, and Osman Tezel of Saint-Gobain Group.[85]

89.     **FIPAH.** FIPAH's website declares that it was founded "with the aim of promoting

the common interests of the 'Concrete and Mortar Admixtures Industry.'"

90.     **SYNDAD.** One of SYNAD's stated goals is to "to establish a relationship between

all market players." SYNAD representatives currently serving on EFCA committees include

Claude Le Fur, Jean-Philippe Bigas, and Maxime Julliot.[86] Claude Le Fur worked at Sika from

2008 through July of 2021, and his last role was "Manager of Business Development for Europe

South and Middle East."[87] Jean-Philippe Bigas began working for Chryso in 2006, and has served

as its "Technical Director in charge of regulatory aspects and sustainable development" since June

of 2023.[88] Maxime Julliot works as a Market Manager at Master Builders Group.[89]

91.     **ASSIAD.** Part of ASSIAD's mission is to "bring together the interested companies

or groups thereof to discuss issues of common interest." The ASSIAD website lists 11 "Consiglio

Generale" members, including Leonardo Messaggi of Sika (President), Mario Casali of GCP,

Donato Luciano of Chryso, and Roberto Spaggiari of Master Builders Group.[90] On April 9, 2021,

ASSIAD announced four new members of the ASSIAD Board, including Donato Luciano of

---

[85]     EFCA, Committees, https://www.efca.info/efca-committees/; Marko Kaisanlahti, LinkedIn Profile, https://www.linkedin.com/in/marko-kaisanlahti-28ab2b116/?originalSubdomain=fi; Mark Schneider, LinkedIn Profile, https://www.linkedin.com/in/mark-schneider-157a57108/?originalSubdomain=ch; Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr; Bjorn Stockmann, LinkedIn Profile, https://www.linkedin.com/in/bj%C3%B8rn-stockmann-52346034/?originalSubdomain=no; Andres Larsson, LinkedIn Profile, https://www.linkedin.com/in/anders-larsson-3278731b7/?originalSubdomain=se; Master Builders Solutions, Meet Our Team, https://masterfiber.master-builders-solutions.com/contact/contact.

[86]     EFCA, Committees, https://www.efca.info/efca-committees/.

[87]     Claude Le Fur, LinkedIn Profile, https://www.linkedin.com/in/claude-le-fur-a4735857/?originalSubdomain=fr.

[88]     Jean Philippe Bigas, LinkedIn Profile, https://www.linkedin.com/in/jean-philippe-bigas-658a07b5/?originalSubdomain=fr.

[89]     Master Builders Solutions, Meet Our Team, https://masterfiber.master-builders-solutions.com/contact/contact.

[90]     ASSIAD, The Structure, https://www.assiad.it/LAssociazione/La-struttura.

Master Builders Group, Jean Mascaro of Chryso, and Leonardo Messaggi of Sika.[91]

92.    On July 21, 2023, ASSIAD announced that Leonardo Messaggi of Sika was elected President of ASSIAD for the period from 2023 to 2027.[92] Leonardo Messaggi has worked for Sika since 2016 and currently serves as "Target Market Manager for Concrete & Industrial Flooring."[93] In addition, Paolo Novello of Chryso serves as the Vice President of ASSIAD.[94]

93.    On October 4, 2023, ASSIAD announced the creation of a new Technical Evolution Committee made up of 13 members, including Fabrizio Avallone and Cristiano Cereda of Sika, Mario Casali and Pietro Massinari of Chryso, and Ivana Torresan of Master Builders Group.[95]

94.    On October 5, 2023, Messaggi announced that the thirteen (13) members of the new Technical Evolution Committee would participate in roundtables at the first "General States of Concrete Technology" at SAIE Bari, an industry meeting, in October of 2023.[96] Sika, Chryso, GCP, and Master Builders Group were all scheduled to participate as "exhibitors" at this meeting.[97]

95.    **NCCA.** NCCA representatives currently serving on EFCA committees include

[91]    Press Release, ASSIAD, Two New Additions to the General Council (Apr. 9, 2021), https://www.assiad.it/News/due-nuovi-ingressi-nel-consiglio-generale.

[92]    Press Release, ASSIAD, ASSIAD Announces the Election of the New President and Vice Presidents for the Four-Year period 2023-2027 (July 21, 2023), https://www.assiad.it/News/assiad-annuncia-lelezione-del-nuovo-presidente-e-dei-vicepresidenti-per-il-quadriennio-2023-2027.

[93]    Leonardo Messaggi, LinkedIn Profile, https://www.linkedin.com/in/leonardo-messaggi-5b949670/?locale=en_US.

[94]    ASSIAD, The Scientific Steering Committee and Technical Evolution Committee of ASSIAD are Born (Oct. 4, 2023), https://www.assiad.it/News/nascono-il-comitato-di-indirizzo-scientifico-e-comitato-evoluzione-tecnica-di-assiad; Ingenio, Concrete and Construction Post-Covid: Companies are Ready to Adopt the "Circular Economy" (July 29, 2020), https://www.ingenio-web.it/articoli/calcestruzzo-e-edilizia-post-covid-le-imprese-sono-pronte-ad-adottare-la-circular-economy/; Arketipo, ICARE Cement Technology by Chryso (Aug. 28, 2020), https://www.arketipomagazine.it/tecnologia-per-il-cemento-icare-by-chryso/; Paolo Novello, LinkedIn Profile, https://www.linkedin.com/in/paolo-novello-bab315b2/?originalSubdomain=it.

[95]    ASSIAD, The Scientific Steering Committee and Technical Evolution Committee of ASSIAD are Born (Oct. 4, 2023), https://www.assiad.it/News/nascono-il-comitato-di-indirizzo-scientifico-e-comitato-evoluzione-tecnica-di-assiad.

[96]    Ingenio, ASSIAD Among the Protagonists at the General States on Concrete Technology at SAIE Bari 2023 (Oct. 5, 2023), https://www.ingenio-web.it/articoli/assiad-tra-i-protagonisti-agli-stati-generali-della-tecnologia-del-calcestruzzo-al-saie-bari-2023/.

[97]    *Id.*

Trond Solbo and Bjorn Stockmann, who both work for Sika.[98] As explained herein, these Sika employees met with executives from other Defendants in their roles as EFCA committee members.

96.    **ANFAH.** ANFAH members represent "around 90% of the admixtures used in Spain."[99]

97.    **SACA.** SACA representatives currently serving on EFCA committees include Anders Larsson, who works for Sika.[100] As explained herein, Anders Larsson met with executives from other Defendants in his role as an EFCA committee member.

98.    **KUB.** KUB boasts that it "dominates 80% of the Turkish market," which itself makes up 40% of the total concrete admixture market in Europe.[101] On March 13, 2020, KUB announced that Turgay Ozkun, a General Manager at Sika, had been elected as Chairman of the Board. At the same time, Osman Ilgen, a Vice President with Saint-Gobain Group, was elected as Vice President of the Board, and Suat Seven of Master Builders Group was also elected to the Board.[102] Osman Ilgen currently serves as both President of KUB and Vice President of EFCA.[103]

99.    **CAA.** Two Master Builders Group executives currently hold leadership positions in the CAA: Chris Fletcher, a Master Builders Group Managing Director, is Chairman of the CAA Council, which "[e]stablishes and implements policy, promotes admixture use, [and] manages [CAA's] committees, task groups, and finances," while Ian Ellis, formerly a Master Builders

---

[98]    SAIE, Exhibitor Preview, https://eventi.senaf.it/preview-espositori.php?CSRFName=CSRFGuard_330546167&CSRFToken=7908882XTY66GK7IT8RA8XB7KGFK67NWMU5BCCDDP5O0T8VC1XGIJSJ3T8EOOB7B&rag_soc=master+builders&rag_soc_inizia=&settore=&ide=1816&action=reimposta.

[99]    EFCA, Spain – ANFAH, https://www.efca.info/efca-members/spain-anfah/.

[100]    EFCA, Committees, https://www.efca.info/efca-committees; Anders Larsson, LinkedIn Profile, https://www.linkedin.com/in/anders-larsson-3278731b7/?originalSubdomain=se.

[101]    KUB, About Us, https://kub.org.tr/hakkimizda/.

[102]    EFCA, New KUB President, https://www.efca.info/2020/03/13/new-kub-president/; Stuat Seven, LinkedIn Profile, https://www.linkedin.com/in/suat-seven-b9a7403a/?originalSubdomain=tr.

[103]    Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr; EFCA, Structure, https://www.efca.info/about-us/efca-structure/.

Group Technical Services Manager, is Chairman of the CAA Technical Committee, which "[s]upports work on UK and European Standards, Codes, and Certification [and] [p]romotes improvements in technical information, quality control, and level of technical support provided by CAA members."[104] Ian Ellis is also a member of the EFCA Technical Committee.[105]

### E.   The Prices for Defendants' CCAs Have Climbed Exponentially During the Class Period and Several Defendants Have Signaled Price Increases Publicly

#### 1.   Defendants Have Exponentially Increased Their Prices on CCAs During the Class Period, Including by Imposing Surcharges

100.   Publicly available financial reports and statements suggest that Defendants have consistently raised their prices for CCAs, including through surcharges, during the Class Period.

101.   For example, during an earnings call in April of 2022, RPM VP, Controller, and CAO Michael Laroche pointed to Euclid Group's concrete admixtures as one of the company's "fastest-growing businesses" and cited "selling price increases" as a key growth factor.[106] One year later, in an earnings release published in April of 2023, RPM noted that "record" sales in its construction segment were "driven by price increases and strength in concrete admixtures."[107]

102.   An investor report published by Saint-Gobain Group in February of 2021 cited "[u]pward trends in sales prices" as a key driver of the company's sales growth in 2020.[108] The same report published one year later similarly noted an "acceleration in prices in all segments" in

---

[104]     Cement Admixtures Association, CAA Structure, https://www.admixtures.org.uk/about-us/caa-structure/; Chris Fletcher, LinkedIn Profile, https://www.linkedin.com/in/chris-fletcher-84685137/?originalSubdomain=uk; Ian Ellis, LinkedIn Profile, https://www.linkedin.com/in/ian-ellis-72a94115/?originalSubdomain=uk.

[105]     EFCA, Committees, https://www.efca.info/efca-committees/.

[106]     RPM, Q3 2022 Earnings Call Transcript (Apr. 6, 2022), https://www.rpminc.com/media/3483/rpm-usq_transcript_2022-04-06.pdf.

[107]     RPM, RPM Reports Record Fiscal 2023 Third-Quarter Results (Apr. 6, 2023), https://www.rpminc.com/media/4672/q3-23-rpm-earnings-release-final.pdf.

[108]     Saint-Gobain, FY 2020 Results and Outlook (Feb. 26, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/fy-2020-ang-a_0.pdf.

2021.[109] The report emphasized that Saint-Gobain Group had exhibited "strong pricing power and decisive execution" in raising its prices by as much as 10% to match the industry trend.[110] A press release published by Saint-Gobain Group in October of 2021 included a chart showing an average price increase of 9.7% across all of its segments over the previous two years.[111] In the Americas, Saint-Gobain's prices increased by 18.6% from October of 2019 to October of 2021.[112]

103.    Defendants have also signaled CCA price increases publicly during the Class Period. Examples are set forth below.

104.    In February of 2019, Sika CEO Paul Schuler announced that Sika would raise its prices for the second time that year: "We are going to increase prices further. We have increased prices in January and we will do it again in March."[113]

105.    On November 13, 2020, Master Builders Group announced that it would raise its CCA prices up to 10%, effective immediately.[114]

106.    On July 20, 2021, Masters Builders Group announced that it would be increasing previously-imposed surcharges on its products, including on CCAs, from six percent (6%) to nine percent (9%).[115]

107.    On November 29, 2021, GCP announced that it would raise its CCA prices up to

---

[109]    Saint-Gobain, FY 2021 Results and Outlook (Feb. 25, 2022), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/FY2021_ENG.pdf.

[110]    *Id.*

[111]    Saint-Gobain, Press Release (Oct. 28, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CP_CA_9M_2021_VA.pdf.

[112]    *Id.*

[113]    Reuters, Sika Raises Prices to Counter Jump in Raw Material Costs (Feb. 22, 2019), https://www.reuters.com/article/sika-results-materials/sika-raises-prices-to-counter-jump-in-raw-material-costs-idUSZ8N1UN01Y/.

[114]    Sika, Master Builders Solutions to Increase Prices for Construction Chemicals (Nov. 13, 2020), https://mbcc.sika.com/en-vn/about-us/news/price-increase-announcement.

[115]    Letter from Konrad Wernthaler, Senior Vice President at Master Builders Group, to Customers (July 20, 2021), https://www.negwer.com/Portals/0/Documents/Vendor%20News/2021%20Price%20Increases/2021_07_20_Master%20Builders%20Solutions%20Surcharge%20Letter_EN.pdf?ver=2021-07-21-080522-810.

10% for North American customers, effective in January of 2022.[116]

108.    On January 14, 2022, Master Builders Group announced that it would be increasing previously-imposed surcharges on its products, including on CCAs, to be as high as forty percent (40%).[117]

109.    Also in January of 2022, Sika announced it, too, would be increasing its previously-imposed surcharges on its products, including CCAs, from sixteen percent (16%) to twenty percent (20%).[118]

110.    These announcements were publicly disseminated and received substantial news coverage.

111.    Indeed, in an article published in August of 2020, an industry consultant noted that despite declining sales in the construction industry, the United States had seen an increase of eleven percent (11%) in the construction-cost-index (CCI), including a four percent (4%) increase in prices for products made of concrete.[119] He explained that "[t]he fall in prices feared in many branches, like automotive or plant engineering, is not noticeable in the construction sector."[120] The consultant went on to suggest that players in construction-related industries should continue to raise their prices.[121]

---

[116]    Concrete Products, Raw Material, Freight Costs Drive GCP Admixture Price Increase (Nov. 29, 2021), https://concreteproducts.com/index.php/2021/11/29/raw-material-freight-costs-drive-gcp-admixture-price-increase/#:~:text=GCP%20Applied%20Technologies%20will%20raise,American%20customers%2C%20effective%20January%202022.

[117]    Letter from Konrad Wernthaler, Senior Vice President at Master Builders Group, to Customers (Jan. 14, 2022), https://www.glenrockcompany.com/wp-content/uploads/2022/01/LtrForWebsite-Jasn27_2022.pdf.

[118]    Letter from Michal Mastro, Vice President at Sika, to Customers (Jan. 2022), https://www.glenrockcompany.com/wp-content/uploads/2022/01/LtrForWebsite-Jasn27_2022.pdf.

[119]    ZKG Cement, Smart Pricing Strategies in the Pandemic, https://www.zkg.de/en/artikel/zkg_Smart_pricing_strategies_in_the_pandemic-3562339.html.

[120]    Id.

[121]    Id.

112.    The average price of CCAs imported into the United States also climbed exponentially during the Class Period. As shown in **Figure 9**, below, the prices of imported CCAs remained generally steady between 2010 and 2019 before rising sharply in 2020:

*Figure 9: Import Prices of CCAs ($/kg)*



113.   Prices for CCAs imported in the United States and its territories closely track the prices for CCAs exported from European countries. This is shown in **Figure 10**:

| *Figure 10: European Export Prices of CCAs Versus US Import Prices* |
|---|



114.    Similarly, prices for CCAs imported into the United States and its territories closely track prices for CCAs imported into European countries. This is shown in **Figure 11**:

**Figure 11: European Import Prices of CCAs Versus US Import Prices**



115.    In sum, and as shown above, Defendants' price increases and surcharges have resulted in the prices for CCAs sold in the United States and its territories to increase dramatically during the Class Period. Specifically, prices for CCAs sold in the United States and its territories have roughly doubling during the Class Period.

### 2.    Normal Market Forces Do Not Explain Defendants' Price Increases or Surcharges

116.    Defendants have justified their price increases during the Class Period by citing increases in input costs and supply chain constrains. For example, when Master Builders Group

37

raised prices for its CCAs by as much as 10% in November of 2020, the company blamed "supply constraints in key raw materials" and "an increase in raw material cost and several other related costs including freight." In explaining GCP's decision to raise its CCA prices by 10% in January of 2022, GCP Specialty Construction Chemicals President David Campos stated, "The global supply chain impacts on raw material and freight costs have been unprecedented over the past six months and input costs are not expected to subside in the near-term."[122] RPM's Laroche similarly justified price increases as necessary "to offset significant raw material inflationary pressure."[123]

117.     However, Defendants' material price increases for and imposition of surcharges on CCAs cannot be explained by normal market forces.

---

[122]     Concrete Products, Raw Material, Freight Costs Drive GCP Admixture Price Increase (Nov. 29, 2021), https://concreteproducts.com/index.php/2021/11/29/raw-material-freight-costs-drive-gcp-admixture-price-increase/#:~:text=GCP%20Applied%20Technologies%20will%20raise,American%20customers%2C%20effective%20January%202022.

[123]     RPM, Q4 2022 Earnings Call Transcript (July 25, 2022), https://www.rpminc.com/media/3784/rpm-usq_transcript_2022-07-25.pdf.

118.    As shown in **Figure 12** the prices for *some* raw materials for CCAs spiked *briefly* during COVID, but have since fallen dramatically:

### Figure 12: Prices for Aluminum Compounds (Accelerator), Fatty Acids (Air Entrainer), & Synthetic Organic Plasticizers (Water Reducer)



119.    Indeed, as shown in **Figure 13**, the prices for other raw materials for CCAs have *decreased* during the Class Period:[124]

| Figure 13: Price for Sodium Lignosulfonate (Plasticizer) |
| :---: |



[124]    ChemAnalyst, Sodium Lignosulphonate Price Trend and Forecast, https://www.chemanalyst.com/Pricing-data/sodium-lignosulphonate-1140.

120.     Similarly,   ocean   freight   rates   spiked   sharply   and   briefly   during   COVID, particularly for trans-Atlantic cargo, but have since fallen dramatically. This is shown in **Figure 14**:[125]

| Figure 14: Ocean Container Freight Rates |
|---|



121.     As the above figures show, raw materials cost increases alone do not explain Defendants' astronomical CCA price increases, including surcharges, during the Class Period. The timing and duration of the raw materials cost increases do not fully align with the CCA price increases.   Moreover,   while   some   CCA   raw   materials   saw   higher   prices,   others   were   flat   or declined. Similarly, the increase in freight costs during COVID was short-lived, stabilizing after a few months before beginning to decrease. The duration of shipping cost increases does not explain the persistent increase in CCA prices, including surcharges, since 2019.

---

[125]     Freight   Waves,   Trans-Atlantic   shipping   rates   keep   sinking   as   imports   from   Europe   fall   (Apr.   28,   2023), https://www.freightwaves.com/news/trans-atlantic-shipping-rates-keep-sinking-as-imports-from-europe-fall.

### 3.   *Defendants Have Admitted Normal Market Forces Do Not Explain Their Price Increases or Surcharges*

122.   Defendants have admitted that their higher profit margins were driven by price increases that outpaced any increases in input costs.

123.   For example, during Saint-Gobain Group's earnings call in July of 2019, CFO Sreedhar N. noted that Saint-Gobain Group had "remained focused on price in spite of … the fact that there was a lower trend in the inflation."[126] He explained that keeping prices high had helped the company "not only to offset the inflation," but also to maintain a "positive spread" and, therefore, increased profits.[127] Over the next two years, Saint-Gobain Group continued to raise its prices and increase its profits. A press release from October of 2021 explained that Saint-Gobain Group was "confident that it w[ould] be able to offset raw material and energy cost inflation over full-year 2021" given "the sharp 8.7% acceleration in prices" over the previous year, as well as "the new price increase announcements in Europe and in the [United States]."[128]

124.   Similarly, Sika CFO Adrian Widmer admitted during an earnings call in February of 2020 that the impact of increases in raw material costs was "only . . . marginal," and that Sika had continued to improve its material margin by remaining "very much . . . focused on pricing."[129] During another earnings call one year later, Widmer explained that Sika's material margin of 54.8% in 2020 was "supported by *decreasing* raw material costs . . . in combination with

---

[126]   Compagnie de Saint-Gobain, First-Half 2019 Earnings Call Transcript (Jul. 26, 2019), https://seekingalpha.com/article/4278326-compagnie-de-saint-gobains-codgf-ceo-pierre-andre-de-chalendar-on-first-half-2019-results.

[127]   *Id.*

[128]   Saint-Gobain, Press Release (Oct. 28, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CP_CA_9M_2021_VA.pdf.

[129]   Sika AG, Full Year 2019 Earnings Call Transcript (Feb. 21, 2020), https://seekingalpha.com/article/4326363-sika-ag-sxyay-ceo-paul-schuler-on-full-year-2019-results-earnings-call-transcript.

disciplined pricing," which allowed it to "add[] 50 basis points in price effect."[130]

125.    RPM's Sullivan bragged about his company's ability to maintain its high pricing when asked whether Euclid Group intended to cut its prices due to recent, slumping demand: "In the past cycles, we've been able to maintain the vast majority of the price increases that we've initiated, and we would expect to do exactly the same thing here. If you look at our performance in past commodity cycles on the down cycle, we should pick up $100 million to $200 million of margin benefit and we're working hard to do that, and we intend to do it."[131]

126.    Several Defendants have cited their "***pricing discipline***" in explaining profit margin increases to investors.

127.    For example, Sika CEO Thomas Hasler explained that the "remarkable" increase in Sika's material margin in the first half of 2023 was "a result of our pricing discipline and excellence."[132] This was echoed in Sika's 2023 Half-Year Report, which reported "***disciplined sales price management***," coupled with lower costs, as improving its gross margin.[133]

128.    Similarly, in an October of 2021 press release, Saint-Gobain Group cited a "[c]onstant focus on the price-cost spread" and "***strong pricing discipline*** amid strong inflation" as its "strategic priorities" for 2021.[134]

129.    And in July of 2023, when an analyst asked RPM's Sullivan what had driven the

[130]    Sika AG, Q4 2020 Earnings Call Transcript (Feb. 20, 2021), https://seekingalpha.com/article/4407686-sika-ag-sxyay-ceo-paul-schuler-on-q4-2020-results-earnings-call-transcript (emphasis added).

[131]    RPM, Q2 2023 Earnings Call Transcript (Jan. 5, 2023), https://www.rpminc.com/media/4564/rpm-usq_transcript_2023-01-05.pdf.

[132]    Sika AG, Q2 2023 Earnings Call Transcript (Aug. 4, 2023), https://seekingalpha.com/article/4624149-sika-ag-sxyay-q2-2023-earnings-call-transcript.

[133]    Sika, Half-Year Report (2023), 19 https://www.sika.com/content/dam/dms/corporate/media/glo-hy-2023-half-year-report.pdf?_gl=1*1smz2e5*_ga*MjA0NzgwMDU4NC4xNjk3ODI0MDYx*_ga_K04G1QB2XC*MTcwMDIzNDU0NC40LjEuMTcwMDIzNDU2OS4wLjAuMA (emphasis added).

[134]    Saint-Gobain, Press Release (Oct. 28, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CP_CA_9M_2021_VA.pdf (emphasis added).

"significant increase" in profit margin for RPM's construction segment in the prior quarter, Sullivan boasted about Euclid Group's pricing discipline: "[W]e had a few distributors that were hinting at ... we can boost some product if you discount. And I think ***we held our pricing and held our discipline***. And let's say everybody held their breath until they needed inventory, and it started showing up in May. And that positive trend is continuing as we enter the first quarter."[135]

### F.   Defendants Have Consolidated Their Control Over CCAs

130.    Beginning at least as early as 2014, Compagnie de Saint-Gobain S.A. launched a hostile takeover of Sika AG.[136] Between 2014 and 2018, Compagnie de Saint-Gobain S.A. acquired almost 25% of Sika AG's stock and was the single largest shareholder.[137] However, on May 11, 2018, Compagnie de Saint-Gobain S.A. abandoned its takeover attempt, and agreed to reduce its stake to more than ten percent, which it agreed to hold for at least two years.[138] Before selling its Sika AG stock in 2020, Compagnie de Saint-Gobain S.A. was the largest shareholder in Sika AG.[139]

131.    As this merger began to falter, Compagnie de Saint-Gobain S.A. and Sika AG, through their shared ownership and financial interests, began a coordinated campaign of buying

---

[135]    RPM Q4 2023 Earnings Call Transcript (Jul. 26, 2023), https://www.rpminc.com/media/4837/rpm-q4-23-transcript.pdf (emphasis added).

[136]    Saint-Gobain Remains Committed to Deal to Take over Sika, https://www.reuters.com/article/us-sika-cie-saint-gobain-idUSKBN1300II (last updated Nov. 5, 2016).

[137]    Market Watch, Saint-Gobain, Sika and Burkard Family End Dispute (May 11, 2018), https://www.marketwatch.com/story/saint-gobain-sika-and-burkard-family-end-dispute-2018-05-11; VY Tyndall Global Select Fund Commentary, 5 (Oct. 2019), https://www.tyndallim.co.tk/wp-content/uploads/2019/11/1910-VT-Tyndall-Global-Select-Fund-Commentary.pdf; Saint-Gobain Sells Sika Stake, Formally Ending Bitter Takeover Battle, https://www.reuters.com/article/us-sika-m-a-saintgobain/saint-gobain-sells-sika-stake-formally-ending-bitter-takeover-battle-idUSKBN2331J1 (last updated May 27, 2020).

[138]    Market Watch, Saint-Gobain, Sika and Burkard Family End Dispute (May 11, 2018), https://www.marketwatch.com/story/saint-gobain-sika-and-burkard-family-end-dispute-2018-05-11; Saint-Gobain's U.S. Deal will Cement its Sika Envy, https://www.reuters.com/breakingviews/saint-gobains-us-deal-will-cement-its-sika-envy-2021-12-06/ (last updated Dec. 6, 2021).

[139]    VY Tyndall Global Select Fund Commentary, 5 (Oct. 2019), https://www.tyndallim.co.uk/wp-content/uploads/2019/11/1910-VT-Tyndall-Global-Select-Fund-Commentary.pdf; Saint-Gobain Sells Sika Stake, Formally Ending Bitter Takeover Battle, https://www.reuters.com/article/us-sika-m-a-saintgobain/saint-gobain-sells-sika-stake-formally-ending-bitter-takeover-battle-idUSKBN2331J1 (last updated May 27, 2020).

up their smaller competitors. At all times, these efforts were aided and abetted by Cinven, a private equity firm with substantial investments in the CCA space. Euclid Group joined in its co-conspirators' consolidation efforts no later than April of 2022.

132.    With regard to Compagnie de Saint-Gobain S.A. and beginning in March of 2017, Cinven acquired Chryso.[140] In the months that followed, Chryso, under the ownership and control of Cinven, acquired at least four competing CCA manufacturers,[141] including Italy's Ruredil in June of 2018,[142] Portugal's Euromodal in October of 2018,[143] Ireland's Chemtec in October of 2018,[144] and Morocco's Aptex in October of 2020.[145] Compagnie de Saint-Gobain S.A. acquired Chryso from Cinven in September of 2021, and then, just three months later, in December of 2021, acquired GCP.[146]

133.    Compagnie de Saint-Gobain S.A. subsequently consolidated its management of these earlier-competitors under the control of a newly-created "Construction Chemicals Business Unit" and appointed the incumbent Chryso President, Steve Williams, as the President of this unit,[147] and incumbent Chryso CEO, Thierry Bernard (who was previously employed by Cinven),

---

[140]    CHRYSO, Completion of the Acquisition of Chryso by Cinven (July 8, 2017), https://www.chrysogulf.com/news/83/completion-of-the-acquisition-of-chryso-by-cinven.

[141]    Cinven, Cinven to Sell Chryso to Saint Gobain (May 20, 2021), https://www.cinven.com/media/news/cinven-to-sell-chryso-to-saint-gobain.

[142]    Cinven, Chryso to Acquire Certain Ruredil assets and Enlarges its Offering for Construction Materials in Italy (June 28, 2018), https://www.cinven.com/media/news/chryso-to-acquire-certain-ruredil-assets-and-enlarges-its-offering-for-construction-materials-in-italy/.

[143]    Cinven, Chryso Acquires Euromodal and Enlarges its Offering for Construction Materials in Portugal (Oct. 19, 2018), https://www.cinven.com/media/news/chryso-acquires-euromodal-and-enlarges-its-offering-for-construction-materials-in-portugal/.

[144]    CHRYSO, Chryso Acquires Chemtec Admixtures Limited in Ireland (Oct. 3, 2018), https://uk.chryso.com/news/195/chryso-acquires-chemtec-admixtures-limited-in-ireland.

[145]    CHRYSO, Chryso Strengthens its Presence in Morocco with Aptex (Oct. 15, 2020), https://www.chryso.com/news/chryso-strengthens-its-presence-in-morocco-with-aptex/.

[146]    Chemical & Engineering News, Saint-Gobain to Buy Construction Chemical Maker GCP for $2.3 Billion (Dec. 7, 2021), https://cen.acs.org/business/specialty-chemicals/Saint-Gobain-buy-construction-chemical/99/web/2021/12.

[147]    Business Wire, Steve Williams Appointed President of the Newly Created Construction Chemicals Business Unit for North America (Oct. 17, 2022), https://www.businesswire.com/news/home/20221012005926/en/Steve-Williams-Appointed-President-of-the-Newly-Created-Construction-Chemicals-Business-Unit-for-North-America.

as the General Manager of this unit.[148] Compagnie de Saint-Gobain S.A. has combined Chryso and GCP's manufacturing and sale of CCAs, such that these former competitors now operate as a single, combined unit.[149]

134.     With regard to Sika AG and beginning in late 2018, Sika AG expressed an interest in acquiring Master Builders Group, which at the time, was owned by BASF.[150] But after acquiring another major competitor in the CCA space—France's Parex— in January of 2019,[151] Sika AG initially abandoned its interest in Master Builders Group because, according to its CEO, it did "not believe a deal for all the company would be possible because of anti-trust concerns by regulators."[152] BASF eventually sold Master Builders Group to another hedge fund (Lone Star) for €3.17 billion, the sale of which closed in the third quarter of 2020.[153]

135.     Then, just one year later, in November of 2021, Sika AG announced that it would be acquiring Master Builders Group for $5.9 billion – nearly double what Lone Star had paid for it.[154] However, due to "competition concerns" raised by the UK's CMA, Cinven (which, as noted above, had just sold Chryso to Compagnie de Saint-Gobain S.A.) acquired MBSD's United States

---

[148]     CHRYSO, New Business Unit Within Saint-Gobain High Performance Solutions: Constructions Chemicals (Oct. 3, 2022), https://www.chryso.com/news/new-business-unit-within-saint-gobain-high-performance-solutions-construction-chemicals/.

[149]     Concrete Products, Saint-Gobain Institutes Integrated Chryso, GCP Production Strategy (July 3, 2023), https://concreteproducts.net/products/concrete-construction-materials/lone-star-funds-to-acquire-master-builders_c#:~:text=BASF%20has%20finally%20found%20a,of%20BASF's%20Construction%20Chemicals%20business. Concrete Products, Saint-Gobain Proceeds with Integrated Chryso, GCP Production (Aug. 14, 2023).

[150]     Sika Interested in Parts of BASF's Construction Chemical Business, https://www.reuters.com/article/us-sika-ceo-basf/sika-interested-in-parts-of-basfs-construction-chemicals-business-idUSKCN1QB1CP (last updated Feb. 22, 2019).

[151]     CVC, Sika Makes Binding Offer to Acquire Parex (Jan. 8, 2019), https://www.cvc.com/media/news/2019/2019-01-08-sika-makes-binding-offer-to-acquire-parex/.

[152]     BRIEF-Sika CEO Rules out Deal for Whole BASF Construction Chemical Business, https://www.reuters.com/article/brief-sika-ceo-rules-out-deal-for-whole-basf-construction-chemical-business-idUKZ8N1UN017 (last updated Jan. 8, 2019).

[153]     Concrete Construction, Lone Star Funds to Acquire Master Builders (Dec. 27, 2019), https://www.concreteconstruction.net/products/concrete-construction-materials/lone-star-funds-to-acquire-master-builders_c#:~:text=BASF%20has%20finally%20found%20a,of%20BASF's%20Construction%20Chemicals%20business.

[154]     Chemical Engineering, Sika to Acquire MBCC Group for €5.2 billion (Nov. 11, 2021), https://www.chemengonline.com/sika-to-acquire-mbcc-group-for-e5-2-billion/?printmode=1.

assets, including MBSA, in early 2023.[155] Specifically, MBSD's assets were split into two parts: the first, which encompassed MBSD's assets in the UK, United States, Canada, Europe, Australia, and New Zealand, was sold to Cinven; and the second, which encompassed MBSD's assets in the rest of the World, was sold to Sika AG. While this arrangement appeared to appease antitrust regulators around the World, it was soon revealed that it yielded anticompetitive effects. Sika has admitted that it views Cinven as its partner, not its competitor. Remarking on the spin-off, Sika's CEO, Thomas Hasler, remarked, "Cinven with its extensive expertise in this sector is an ***ideal partner*** for continuing the successful growth path of this business. . . ."[156] Hasler also bragged about Sika's dominance in the concrete admixture industry following the deal with MBSD, stating that its "product offering in the segment of concrete admixture is super strong and almost [] unchallengeable by others because we now have really the full innovation pipeline for the future ready and also very strong backup with the supply chain that is coming together."[157]

136. With regard to Euclid Group, in November of 2021, RPM acquired J.W. Brett Inc. d/b/a Brett Admixtures, and in April of 2022,[158] RPM acquired Chryso's North American cement grinding aids and additives business from Saint-Gobain Group.[159]

---

[155]     Adhesives & Sealants Industry, Sika to Sell MBCC Group's Chemical Admixture Assets to Cinven (Mar. 27, 2023), https://www.adhesivesmag.com/articles/100079-sika-to-sell-mbcc-groups-chemical-admixture-assets-to-cinven.

[156]     Saint-Gobain's U.S. Deal will Cement its Sika Envy, https://www.reuters.com/breakingviews/saint-gobains-us-deal-will-cement-its-sika-envy-2021-12-06/ (last updated Dec. 6, 2021) (emphasis added).

[157]     Sika AG, Q2 2023 Earnings Call Transcript (Aug. 4, 2023), https://seekingalpha.com/article/4624149-sika-ag-sxyay-q2-2023-earnings-call-transcript.

[158]     RPM International, Proxy Statement (Aug. 24, 2022), https://www.rpminc.com/media/3815/proxy-statement.pdf.

[159]     *Id.*

137.   **Figure 15** shows the timing of Defendants' acquisitions:

### Figure 15: Timeline of Defendants' CCA Acquisitions



138.   Sika AG, Compagnie de Saint-Gobain S.A., and RPM's expensive acquisitions of their competitors at a time when raw material costs for CCAs were allegedly skyrocketing makes little economic sense absent a conspiracy to artificially inflate the price of CCAs, such as that alleged here. Indeed, the huge sums paid for these competitors is all the more surprising in light of the trouble that BASF had in unloading Master Builders Group a short time prior.

G.   **The Structure and Characteristics of the Market for CCAs Support the Existence of a Conspiracy**

139.   The structure and other characteristics of the market for CCAs make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

*1.   The Supply Side of the CCA Market Is Highly Concentrated, and the Defendants Are the Dominant Firms*

140.   The presence of a small group of major sellers is one of the conditions that the DOJ

48

has identified as being favorable to collusion.[160] Put differently, a highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

141.    As the DOJ has noted, "mergers can reduce choices for consumers, workers, and other businesses, *leaving them increasingly dependent on larger and more powerful firms that have purchased greater power to dictate the terms of their deals.*"[161] Indeed, the DOJ updated its Merger Guidelines in 2023 to better address the economic consequences of anticompetitive mergers because, as Attorney General Merrick Garland noted, "unchecked consolidation threatens the free and fair markets upon which our economy is based."[162]

142.    The Defendants that were targeted in dawn raids by European antitrust regulators, Defendants Sika, Saint-Gobain Group, and Master Builders Group, are among the largest producers of CCAs in the World, as well as in the United States and its territories.[163]

143.    Other manufacturers of CCAs do not meaningfully compete with Defendants. Several of these other, smaller manufacturers of CCAs told the CMA that even if they wanted to compete with the Defendants, they would not be able to do so effectively because of challenges in scaling up their operations, as well as the reluctance of CCA purchasers to switch from their existing CCA manufacturer(s).[164]

144.    In fact, at least some of the Defendants' internal documents indicate that they

---

[160]    Justice.gov, Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For, https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

[161]    Press Release, Office of Public Affairs, U.S. Department of Justice, Justice Department and Federal Trade Commission Seek to Strengthen Enforcement Against Illegal Mergers (Jan. 18, 2022), https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-seek-strengthen-enforcement-against-illegal (emphasis added).

[162]    Press Release, Office of Public Affairs, U.S. Department of Justice, Justice Department and FTC Seek Comment on Draft Merger Guidelines (July 19, 2023), https://www.justice.gov/opa/pr/justice-department-and-ftc-seek-comment-draft-merger-guidelines.

[163]    Industry ARC, Concrete Admixtures Market – Forecast 2023–2028, https://www.industryarc.com/Report/15114/concrete-admixtures-market.html#:~:text=Major%20players%20in%20the%20Concrete,ve%20Tic.&file=/fileadmin/symrise/Downloads_reports/reports/documents/2023/230308-Symrise-Financial-Report-2022.pdf#page=14.

[164]    *Id.* ¶¶ 107. 113, 118; CMA, Decision on Relevant Merger Situation and Substantial Lessening of Competition, ¶¶ 112, 116, 123 (Sept. 22, 2022).

consider the other Defendants to be their only close competitors.[165]

145.     Because the manufacture of CCAs is highly concentrated, with the Defendants controlling the vast majority of production, this market is highly susceptible to collusion.

### 2.     Barriers to Entry Are High

146.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market.

147.     There are high barriers to entry to effectively compete in the manufacture of CCAs, including the following: (a) the time and cost associated with effectively scaling CCAs manufacturing operations (*i.e.*, building new production and storage facilities in closer proximity to CCA purchasers); (b) the research and development investment required to develop new products (*i.e.*, polymers), and then support their introduction into the market; (c) sellers of the raw materials necessary to manufacture CCAs (*i.e.*, polymers) favor the larger, entrenched manufacturers of CCAs; and (d) the long-standing, existing relationships between CCA manufacturers and customers.[166]

148.     These high barriers to entry are amplified by the difficulty purchasrs of CCAs have in switching manufacturers once selected. This is because smaller suppliers of CCAs cannot quickly build up their scale and capacity for potentially-switching customers,[167] and because supply contracts typically have a term of one to three years.[168] Purchasers of CCAs thus face

---

[165]     CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 89, 96, 101 (Sept. 23, 2022); CMA, Decision on Relevant Merger Situation and Substantial Lessening of Competition, ¶¶ 91, 101, 106 (Sept. 22, 2022).

[166]     *Id.* ¶ 128.

[167]     *Id.* ¶ 50.

[168]     CMA, Initial Report, ¶6.50 (Oct. 25, 2022).

switching costs and are frequently locked-in to purchasing CCAs from the Defendants in this case – the three largest manufacturers and sellers of CCAs in the World, including in the United States and its territories.[169]

149.    The CMA, in determining that the acquisition by Sika AG of MBSD would be anticompetitive, noted as follows: "There are significant barriers to entry and expansion and, although a number of suppliers have expansion plans, these will not have a significant enough effect on the structure of the market to prevent an SLC ["Substantial Lessening of Competition"] even if these plans materialise."[170]

150.    The high barriers to entry in the manufacture of CCAs make it unlikely that supra-competitive prices would result in new competitors entering the market. These high barriers to entry also make the market more susceptible to collusion.

### 3.    *The Demand Side of the CCA Market Is Unconcentrated*

151.    The unconcentrated nature of the demand side of the CCA market also makes this market susceptible to collusion.

152.    In 2021, there were nearly 9,000 concrete and cement product manufacturing establishments in the United States and its territories.[171]

153.    Such a large number of buyers, each of whom forms a small share of the total marketplace, means that there is less incentive for Defendants to cheat on collusive pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

---

[169]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 50 (Sept. 23, 2022).

[170]    CMA, Anticipated Acquisition by Sika AG of MBCC, Group Decision to Refer (Aug. 10, 2022), https://assets.publishing.service.gov.uk/media/63469a408fa8f53465d139b4/Decision_to_refer_full_text__Sika-MBCC_.pdf.

[171]    Census.Gov, 2021 County Business Patterns (CBP) Data, https://www.census.gov/programs-surveys/cbp/data/tables.html (last updated May 19, 2022).

### 4.     *Demand for CCAs Is Inelastic*

154.    Industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices. There are three primary characteristics that demonstrate the inelasticity of demand for CCAs: (a) a lack of substitute goods, (b) the essential nature of CCAs in cement, concrete, and mortar, and (c) CCAs being a small portion of the overall cost of the final good.

### a.      <u>There Are No Substitutes for CCAs</u>

155.    The DOJ has also recognized that standardized products which lack substitutes is a condition favorable to collusion, as substitute goods can serve to restrain price increases and temper the effects of a price-fixing conspiracy.[172]

156.    Purchasers of CCAs do ***not*** view CCAs as interchangeable, nor do purchasers view there as being substitutes for CCAs.[173]

157.    In addition, and as set forth above, purchasers of CCAs face high switching costs as between specific CCAs. This is the case for at least three reasons. <u>First</u>, "extensive testing is required to ensure that any new [CCA] products are suitable for [the customer's] particular aggregates and requirements, with this process becoming more difficult the larger and more complex a [CCA] customer's operations are."[174] <u>Second</u>, purchasers of CCAs frequently have to obtain their own customers' approval before switching CCAs.[175] <u>Third</u>, purchasers of CCAs frequently must train their employees on how to use new CCAs before those CCAs can be used.[176]

---

[172]      Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For (justice.gov), https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

[173]      *Id.* ¶¶ 53-64.

[174]      *Id.* ¶ 11.

[175]      *Id.* ¶ 51.

[176]      *Id.* ¶ 50.

158.    The lack of substitute goods makes this market susceptible to collusion.

**b.      CCAs Are a Necessity**

159.    CCAs are perceived by purchasers as providing economic, commercial, and environmental benefits to the cement, concrete, and mortars that incorporate them. They are therefore viewed as essential to projects involving concrete, cement, and/or mortar.[177]

160.    Purchasers of CCAs are thus unable to respond to price increases by buying less.

161.    Purchasers' need for CCAs also makes this market more susceptible to collusion.

**c.      CCAs Comprise a Small Share of the Cost of the Final Product**

162.    CCAs typically make up only about one percent (1%) to seven percent (7%) of the overall cost of the finished products in which they are used.[178]

163.    As a result, CCA price increases do not, in general, reduce how much product the Defendants' customers purchase, or the revenue that Defendants make on their sales of CCAs.

164.    This also makes this market especially susceptible to collusion.

**H.     Defendants Fraudulently Concealed Their Conduct**

165.    Plaintiff had no knowledge of the Defendants' anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until, at the earliest, October 17, 2023, when the EC announced its investigation into the Defendants and that it was coordinating with the TCA, CMA, and DOJ. As a result, Plaintiff did not discover, nor could it have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before that date. Prior to October 17, 2023, there was insufficient information to suggest that the Defendants were involved in a conspiracy to fix prices for CCAs.

---

[177]    "Sika's product offering is…essential to their end users…" (VY Tyndall Global Select Fund Commentary, October 2019, p. 4); *see also* 2022.10.25_Sika-MBCC_CMA Initial Report at ¶ 6 .30-6.31.

[178]    2022.10.25_Sika-MBCC_CMA Initial Report at ¶ 6.32.

166.    Therefore, the statute of limitations on the claims asserted herein was tolled by fraudulent concealment until at least October 17, 2023. Defendants affirmatively and wrongfully concealed their anticompetitive conduct since the beginning of the Class Period.

167.    Defendants' conspiracy was inherently self-concealing. The success of the conspiracy depended on the Defendants and their co-conspirators keeping the price-fixing conduct alleged herein secret from customers and government authorities. Plaintiff reasonably believed it was purchasing CCAs in a competitive industry.

168.    Defendants and their co-conspirators also took affirmative steps to conceal the conspiracy and carry it out in a manner that would evade detection. For example, each Defendant has a "Code of Conduct" that appears to prohibit exactly the type of conduct they engaged in here.[179]

169.    Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed, Plaintiff did not learn or discover the operative facts giving rise to its claims until October 17, 2023. No information, actual or constructive, was ever made available to Plaintiff that would have led a reasonably diligent person to investigate whether a conspiracy in the market for CCAs existed prior to October 17, 2023.

170.    Moreover, because Plaintiff could not have discovered the existence of its claims prior to October 17, 2023, Plaintiff's claims did not accrue until that date.

## V.    CLASS ACTION ALLEGATIONS

171.    Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a),

---

[179]    Sika, Code of Conduct (May 1, 2021), https://www.sika.com/content/dam/dms/corporate/v/glo-code-of-conduct.pdf; Saint-Gobain Group, General Principles of Conduct and Action, https://www.saint-gobain.com/sites/saint-gobain.com/files/principles_en.pdf; Master Builders Group, Code of Conduct, https://assets.master-builders-solutions.com/en-global/master%20builders%20solutions%20group%20code%20of%20conduct.pdf; RPM, The Values & Expectations of 168 (Apr. 2018), https://www.rpminc.com/media/2114/v_es_final_version_for_the_board_meeting_april_2018.pdf.

(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons and entities in the United States and its territories who purchased CCAs directly from any of the Defendants or their subsidiaries or affiliates during the period beginning no later than May 11, 2018 until the date on which a class is certified in this case. Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, or co-conspirators, and the court and its staff.

172.    ***Numerosity.*** While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the class size is so numerous that joinder is impracticable given Defendants' substantial nationwide presence.

173.    ***Commonality.*** Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, thereby making relief with respect to the Class as a whole appropriate. Such questions of law and fact common to the Class include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to restrict output and fix, raise, maintain or stabilize the prices of CCAs in the United States and its territories;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

(e)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the

members of the Class;

(f)     The effect of the alleged conspiracy on the price of CCAs during the Class Period;

(g)     Whether the Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

(h)     The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

(i)     The appropriate class-wide measure of damages.

174.     **_Typicality._** Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff and undersigned counsel will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for CCAs from Defendants and/or their co-conspirators.

175.     **_Adequacy._** Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

176.     **_Predominance._** The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

177.     **_Superiority._** Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum

simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.   <u>INTERSTATE TRADE AND COMMERCE</u>

178.   Billions of dollars of transactions in CCAs are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce.

179.   Defendants' conspiracy had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.

180.   Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for CCAs in the United States.

181.   Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of CCAs sold in the United States, the prices of CCAs would have been determined by a competitive, efficient market.

## VII.   <u>ANTITRUST INJURY</u>

182.   Defendants' antitrust conspiracy had the following effects, among others:

(a)   Price competition has been restrained or eliminated with respect to the pricing of CCAs;

(b)   The prices of CCAs have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)   Purchasers of CCAs have been deprived of the benefits of free and open competition; and

(d)   Purchasers of CCAs paid artificially inflated prices.

183.   The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize and/or maintain the price of CCAs.

184.   The precise amount of the overcharge impacting the prices of CCAs paid by Plaintiff and the Class can be measured and quantified using well-accepted models.

185.   By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for CCAs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.   CLAIM

### Count I: Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) (Conspiracy in Restraint of Trade)

186.   Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

187.   From at least May 11, 2018, until the date on which any Class is certified, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regards to CCAs in unreasonable restraint of trade in violation of Sections 1 and

3 of the Sherman Act (15 U.S.C. §§ 1, 3).

188.   The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for CCAs, including surcharges on CCAs, in the United States and its territories.

189.   In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including the following:

(a)   exchanging competitively sensitive information among themselves, with the aim to fix, raise, stabilize, or maintain prices of CCAs, including surcharges on CCAs, sold in the United States and its territories;

(b)   participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, raise, stabilize, or maintain prices of CCAs, including surcharges on CCAs, sold in the United States and its territories; and

(c)   participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

190.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, stabilize, or maintain prices of CCAs, including surcharges on CCAs.

191.   Defendants' conspiracy had the following effects, among others:

(a)   Price competition in the market for CCAs has been restrained, suppressed, and/or eliminated;

(b)   Prices for CCAs, including surcharges on CCAs, provided by Defendants

and their co-conspirators have been fixed, raised, stabilized, or maintained at artificially high, non-competitive levels throughout the United States and its territories; and

(c)    Plaintiff and members of the Class who purchased CCAs from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

192.   Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for CCAs purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

193.   The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

194.   Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

## IX.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class respectfully request the following relief:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as representative of the Class and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.    The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a per se

violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination allege herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.     That each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

F.     That the Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

X.      **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: December 7, 2023

Respectfully submitted,

*/s/ Joshua H. Grabar*

Joshua H. Grabar (PA Bar #82525)
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (267) 507-6085
Fax: (267) 507-6048
jgrabar@grabarlaw.com

Joseph E. Mariotti
**CAPUTO & MARIOTTI, P.C.**
730 Main Street
Moosic, PA 18507
T: 570-342-9999
F: 570-457-1533
jmariotti@caputomariotti.com

Mindee J. Reuben
Steven J. Greenfogel
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Tel: (215) 854-4060
Fax: (973) 623-0858
MJR Direct Dial: (215) 704-2524
mreuben@litedepalma.com
sgreenfogel@litedepalma.com

Joseph J. DePalma
**LITE DEPALMA GREENBERG &
AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
jdepalma@litedepalma.com

Marc H. Edelson
**EDELSON LECHTZIN LLP**
411 S. State Street
Suite N300
Newtown, PA 18940
(215) 867-2399
medelson@edelson-law.com

Eric L. Cramer
Patrick F. Madden
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street
Suite 3600
Philadelphia, PA 19103
(215) 875-3000
ecramer@bm.net
pmadden@bm.net
mwallin@bm.net

*Counsel for Plaintiff and the Proposed Class*